## T. P. TAYLOR & CO. v. GLENN, Collector of Internal Revenue.

### No. 776.

District Court, W. D. Kentucky,
Louisville Division.

Sept. 28, 1945.

Louis Seelbach and Bullitt & Middleton, all of Louisville, Ky., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Henry L. Spencer, Sp. Assts. to Atty. Gen., and David C. Walls, U. S. Atty., of Hardinsburg, Ky., for defendant.

MILLER, District Judge.

The plaintiff, T. P. Taylor & Co., brought this action to recover corporation income taxes and corporation excess profits taxes for 1940, and also corporation income taxes, declared value excess profits taxes and corporation excess profits taxes for the year 1941, in the total amount of $18,717.33, with interest, which it alleges was erroneously assessed against it by the Commissioner and thereafter illegally collected by the defendant. The deficiency assessment resulted from a disallowance by the Commissioner of certain salary payments to the President and Vice President of the plaintiff for the two years in question. The plaintiff claims that the amounts paid by it as such salaries and taken as deductions in its income tax return was reasonable compensation for personal services actually rendered and a proper deduction for income tax purposes.

T. P. Taylor, Sr., started a retail drug business in Louisville, Kentucky, about 60 years ago. A son Horace Taylor went into business with his father in 1905, and another son T. P. Taylor, Jr., went into the business in 1909. Both of the sons studied pharmacy at the University of Louisville and became graduate pharmacists. T. P. Taylor, Sr., at that time had several stores in Louisville and his two sons worked through all branches of the business and each finally became manager of one of the stores. Horace Taylor managed the store at Fourth and Walnut Streets and T. P. Taylor, Jr., managed the store at Fourth and Chestnut Streets. T. P. Taylor, Sr., and his sons built up their business until they were finally operating eleven stores in Louisville in 1929. T. P. Taylor, Sr., retired and subsequently died before 1929, and at that time his two sons had acquired all of the interest of their father in the business. In 1929 Horace Taylor and T. P. Taylor, Jr., sold their business to the Whalen Drug Company, which was a subsidiary of the United Cigar Stores, a very large operator of chain drug stores in the United States with offices in New York. The Whalen Drug Company went into the hands of a receiver in 1932. In the Fall of 1932 Horace Taylor and T. P. Taylor, Jr., decided to go back into the drug business and in about October, 1932, incorporated T. P. Taylor & Co., the plaintiff herein, under the laws of Kentucky. Its capital stock was $25,000, consisting of 1,000 shares of $25 each. The original investment also included a surplus of from $4,000 to $5,000. The two sons each bought 50% of the stock. At a later time in December, 1935, the Taylor brothers put into the business an additional $60,000, for which they received 5% preferred stock equally divided between them.

The plaintiff started in business with four stores, located at Fourth and Chestnut, Third and Jefferson, Fourth and Oak and Fourth and Market. In 1934 a fifth store was opened at Third and Broadway in the Weissinger-Gaulbert Building. In 1935 they opened another store at Brook and Broadway, and also one at the loop in the Highlands. In 1938 they opened another store at Cecil and Broadway. In October, 1939, they opened another store at St. Matthews, Kentucky, one of the suburbs of Louisville. About May, 1941, they opened their tenth store on Fourth near Walnut. The plaintiff also established and operated a warehouse and a commissary department. During that period of time the major competition encountered was as

follows: In 1932 the Hook Drug Company of Kentucky operated about six or seven stores in Louisville. The Liggett Company, a subsidiary of the United Drug Company, had one store in the Marion E. Taylor Building at Fourth and Jefferson. The Walgreen Company had about four stores in Louisville. About 1936 the Hook Drug Company sold its Louisville stores to the Walgreen Company, and subsequently the Walgreen Company closed all of the Hook stores but the one situated in the Heyburn Building at Fourth and Broadway. The Liggett Company went out of business in Louisville in 1935.

When the plaintiff company was organized in 1932 Horace Taylor became President and T. P. Taylor, Jr., became Vice President. They devoted practically all of their time and energy to the development of the business of the company, with the two working as a team with the same authority. They jointly decided upon and directed the policy of the company. They also jointly made the selections of locations for new stores and of junior executives who worked under the supervision of the brothers. They also owned in their individual names from 25 to 40 pieces of real estate, which returned to them substantial income. The smaller pieces of real estate were handled by real estate agents. The large pieces were handled by themselves with most of the detail work being done by a woman employee. From time to time it would be necessary for the two brothers to negotiate new leases for these pieces of property. The handling of their individual real estate interests took not more than from two to four percent of their time. Horace Taylor became President of the Board of Aldermen of the City of Louisville in the latter part of 1933 and for a period of four years thereafter spent quite a bit of his time in this work for the City. During this period T. P. Taylor, Jr., became President of the Company and Horace Taylor became Vice President. Horace Taylor also served as a Director of the United Drug Company, which position he resigned in 1929 when he temporarily retired from the business. He also served for a while as a Director of the Louisville Trust Company. During the period of 1939 through 1941 T. P. Taylor, Jr., was a Director in the First National Bank of Louisville, which position required his attendance at directors' meetings for about an hour in the morning one day in each week. He resigned this directorship in 1942 because he did not feel that he could give to the job the time it properly required. Horace Taylor served as President of the National Association of Chain Drug Stores for three 1-year terms, and T. P. Taylor, Jr., was President of the Southern Drug Stores Association for two terms. Both brothers are widely known in the chain drug store business and have the reputation of first-class executives and operators of chain drug stores.

When the Company was organized in 1932 the Taylor brothers adopted the policy of holding salaries to a minimum until the company was on a sound financial basis. No salaries were paid to either of the brothers during 1932 or 1933. In 1934 each was paid a salary of $5,000. In 1935 neither one received any salary. They received no base salaries in 1936, but each was paid a percentage of the profits of the corporation if the profits amounted to $25,000 or more. T. P. Taylor, Jr.'s, percentage was 10% and Horace Taylor's percentage was 5% due to the fact that he was devoting a part of his time to his duties as President of the Board of Aldermen of the City of Louisville. These payments amounted to $3,435.14 to T. P. Taylor, Jr., and $1,717.56 to Horace Taylor. In 1937 base salaries were fixed for each of the brothers at $5,000 plus 5% of the profits if they amounted to $25,000 or more. In 1938 the base salary was raised to $7,500 with the same arrangement with respect to profits as in 1937. This base salary has not been changed since 1938, but in 1939 the percentage compensation was raised to 7% of the profits, and in 1940 to 10% of the profits, and in 1941 to 10% of the profits, if they were less than $50,000, 12½% of the profits if they were $50,000 or more and less than $75,000, and 15% if they were $75,000 or more. Under these arrangements of base salary plus a percentage of the profits each brother received $7,412.23 in 1937, $8,935.96 in 1938, $9,968.68 in 1939, $11,781.17 in 1940, and $22,834.56 in 1941. At the times when the Board of Directors of the Company raised the percentage compensation of the President and Vice President they also raised the percentage compensation for their four junior executives, namely, P. I. Taylor, Bruce Keith, Zachary Cox and Jones Howard, the last three of whom held no stock interest in the corporation. The percentage increases to these junior executives were greater in proportion than the percentage increases to the President and Vice Presi-

dent. In 1939 the compensation of the junior executives averaged about $3,400 per year each. In 1940 it averaged about $4,000 per year each. In 1941 it averaged about $9,000 per year each.

In 1933, which was the first full year of operation, the net sales of the plaintiff company totaled $376,122.16. In 1939 they had increased to $1,075,634.81. In 1940 they totaled $1,236,459.25. In 1941 they increased to $1,715,199.86. The net profits of the Company, after all compensation and before all income taxes, increased from $3,590.99 in 1933 to $47,021.39 in 1941. At the end of 1932 the surplus of the plaintiff company was $6,456.21. At the end of 1941 it had increased to $127,633.54.

The plaintiff paid 5% dividends, or $3,000 per year, on its preferred stock every year after it was issued. No dividends were paid on the common stock until 1937, at which time it paid a dividend of 40%, totaling $10,000. No dividend was paid in 1938, but in both 1939 and in 1940 it paid a 20% dividend, totaling $5,000 each year, and in 1941 it again paid a 40% dividend of $10,000.

The revenue agent who examined the income tax returns of the plaintiff for the years 1940 and 1941 took the position that any increase in compensation paid to T. P. Taylor, Jr., and Horace Taylor in those years over the amount paid them in 1939, which was $9,968.68, was unreasonable and not a proper deduction. Accordingly, the deductions taken for these salary payments were reduced for the year 1940 from $11,781.17 apiece to $9,968.68 apiece, and for the year 1941 from $22,834.56 apiece to $9,968.68 apiece. This resulted in a deficiency income tax assessment as follows:

(1) Corporate income tax, plus interest for 1940 . . . . . . . . . $ 1,025.67

(2) Corporate excess profits tax plus interest for 1940 . . . . 811.99

(3) Corporate income tax, plus interest for 1941 . . . . . . . . 5,352.12
Declared value excess profits tax, plus interest for 1941 . . . . . . . . . . . . . . . 296.55

(4) Corporate excess profits tax, plus interest for 1941 . . 11,231.00
_____
Total . . . . . . . . . . . . . . $18,717.33

The total of this deficiency assessment was paid by the plaintiff to the defendant, Col-lector of Internal Revenue for the District of Kentucky, on March 25, 1944. On April 10, 1944, the plaintiff filed claims for refunds. The Commissioner of Internal Revenue failed to act upon said claims for more than six months, and on November 28, 1944, the plaintiff filed this action to recover the amounts so paid with interest.

The question presented is controlled by Section 23 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code § 23. This section provides in computing net income there shall be allowed as deductions "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *." The only question before the Court is whether or not the total compensation paid by the plaintiff to T. P. Taylor, Jr., and Horace Taylor in 1940 and 1941 was in each instance a reasonable allowance for personal services actually rendered.

 The plaintiff has the burden of proving the reasonableness of the compensation so paid and that these amounts were paid as compensation for services actually rendered. Botany Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379. When it appears that the officers of the corporation receiving the compensation being questioned are also the owners and directors of the corporation, the evidence must be carefully scrutinized to determine whether the so-called compensation for services is not in reality a distribution of profits. L. Schepp Co. v. Commissioner, 25 B. T. A. 419. The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which

would ordinarily be paid. Section 19.23 (a)-6, Treasury Regulations 103.

The question involved in this case has heretofore been considered by this Court in J. D. VanHooser & Co. v. Glenn, Collector, 50 F.Supp. 279. It was pointed out in the opinion in that case that a bonus either in a lump sum or being a percentage of earnings, paid to a stockholder employee corporation at the end of the year, in addition to a fixed salary, does not prevent the total amount paid by the corporation from being reasonable compensation for services; that the size of the amount received, even though large, or a material increase in the amount received in any one year over preceding years does not in itself prevent the payment from being reasonable compensation; that the policy of agreeing to pay a percentage of the earnings before they are earned, or even a lump sum in the nature of a bonus after they are earned, is based primarily upon sound business principles, in that it stimulates the activity, diligence and ambition of the employees and enables the corporation to justly compensate its employees without beforehand incurring the obligation; and that there is no fixed standard or yardstick by which the question of reasonableness of the compensation in any particular case can be measured and that each case must stand upon the facts proved in that particular case. See also Wm. S. Gray & Co. v. United States, 35 F.2d 968, 68 Ct.Cl. 480; United States v. Reitmeyer, D.C., 11 F.2d 648; Wood & Ewer Co. v. Ham, D.C., 14 F.2d 995.

The growth and expansion of the plaintiff's business and its very successful operation from its beginning in 1932 through 1941, shown by the figures hereinabove set out, demonstrates the capable and efficient management which it has had. Defendant's contention that it is largely the result of war-time conditions is not borne out by a review of the statistical data presented. A steady growth and successful operation is shown for a number of years prior to any possible war-time influence. The program of expansion was planned and carried out almost in its entirety before the war influ-, ences had their effect on Louisville retail business. Only one of their ten stores was opened subsequent to 1939, and it was started before the United States entered the war. The growth and successful operation was accomplished in competition with some of the best operated units in the retail drug business. During the period under consideration the operations of some of its competitors in Louisville decreased or ceased while the plaintiff's operations expanded. In addition to the conclusions necessarily drawn from the statistical data introduced in evidence, two well qualified witnesses also testified to the experience and ability of Horace Taylor and T. P. Taylor, Jr., as chain-store executives. In 1929 Horace Taylor declined a salary of $25,000 offered to induce his return to the retail drug business. The president of a large chain of successfully operated drug stores in the South, who was well acquainted with both Horace Taylor and T. P. Taylor, Jr., and the business of the plaintiff, testified that the top salary received by them in 1941 was below their normal earning power and that a salary from $25,000 to $30,000 per year would be a minimum for the services rendered. In opposition to this the evidence of the defendant was very meager and failed to meet the real issue involved. It consisted of but a single witness who was the field agent of the Internal Revenue Department who investigated the plaintiff's return for the two years in question. Although this witness had a good educational background, some ten years of accounting experience with New York insurance companies and several years experience with the Internal Revenue Department, yet he had no experience in business management of any kind and no experience in the retail drug business. He disallowed the salary deductions in part largely because in his opinion the increased earnings resulted from the war economy which was not a proper basis for increased salaries. Nevertheless on cross examination he admitted that the compensation paid for the year 1940 was not unreasonable and that payments for 1941 not in excess of $15,000 a piece were also not unreasonable. No witness was offered by the Government who was experienced in business management or who had firsthand experience with the details and problems of the chain drug store business or what salaries capable and successful executives received. If the compensation received by Horace Taylor and T. P. Taylor, Jr., in the years 1940 and 1941 was unreasonable for the services rendered, certainly the Government could have produced some experienced witness from the retail drug business who would have said so. The lack of such evidence operates very strongly against the defendant's contention.

■ The Court holds on the evidence before it that the compensation paid by the plaintiff company to Horace Taylor and T. P. Taylor, Jr., in the years 1940 and 1941 was in each case reasonable compensation for personal services actually rendered, and proper deductions in the plaintiff's income tax returns for those years. See Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171; Herff Motor Co. v. McCabe, D.C., 41 F.Supp. 1011, affirmed per curiam, 6 Cir., 122 F.2d 1022.