## ROTH OFFICE EQUIPMENT CO. v. GALLAGHER.

### No. 10643.

United States Court of Appeals Sixth Circuit.

Feb. 10, 1949.

William G. Pickrel, of Dayton, Ohio (William G. Pickrel, of Pickrel, Schaeffer & Ebeling, all of Dayton, Ohio, on the brief), for appellant.

Louise Foster, of Washington, D. C. (Theron L. Caudle, Sewall Key, Robert N. Anderson and S. Dee Hanson, all of Washington, D. C., and Ray J. O'Donnell and William J. Dammarell, both of Cincinnati, Ohio, on the brief), for appellee.

Before HICKS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The appellant, The Roth Office Equipment Company, brought suit in the District Court to recover $27,703.12 representing deficiencies in income and excess profits taxes paid for the taxable years ended June 30, 1941 and June 30, 1942. The deficiencies were the result of a disallowance by the Commissioner of deductions taken for compensation paid to three officers of the Company for personal services, the Commissioner holding such payments unreasonable in part. The District Court approved the deductions in full for the year ended June 30, 1941, and in part for the year ended June 30, 1942, and allowed a recovery in the amount of $14,398.60. The appeal is from the disallowance of the remainder of Appellant's claim for the year ended June 30, 1942, in the amount of $13,304.52.

The Appellant is an Ohio corporation organized in 1915 with its principal place of business at Dayton, Ohio. Its business is commercial stationers and office outfitters. During the years in question, the Company had only three officers, C. W. Roth, D. B. McConnaughey and Dayton Storch, who were also stockholders and directors. There were three other directors, one of whom was the wife of the president C. W. Roth. The other two were not associated with the Company. The following chart shows the amounts paid by the Company to each of the three officers, the amounts allowed by the Commissioner and the amounts allowed by the District Court for each of the two fiscal years in question:

### Fiscal Year 1941

| Officer | Claimed | Commissioner | Court |
|---|---|---|---|
| Roth | $24,700.08 | $21,900.08 | $24,700.08 |
| McConnaughey | 13,681.92 | 12,181.92 | 13,681.92 |
| Storch | 8,070.00 | 7,170.00 | 8,070.00 |
| Total | $46,452.00 | $41,252.00 | $46,452.00 |

### Fiscal Year 1942

| Officer | Claimed | Commissioner | Court |
|---|---|---|---|
| Roth | $45,125.04 | $26,825.04 | $35,000.00 |
| McConnaughey | 26,176.96 | 15,576.96 | 20,000.00 |
| Storch | 15,180.00 | 9,080.00 | 12,500.00 |
| Total | $86,482.00 | $51,482.00 | $67,500.00 |

In 1937, the three officers received the following compensation: Roth, $13,000; McConnaughey, $4,000; Storch, $3,500. In 1940 Roth received $15,000; McConnaughey, $7,840; Storch, $4,500. The compensation of each was successively and materially decreased in each of the years 1943, 1944 and 1945 from that received in 1942, until in 1945 Roth received $20,600; McConnaughey received $11,650; and Storch received $6,480.

C. W. Roth, the president, had 45 years experience in the business, the last 30 or so with the Appellant. McConnaughey had been with Appellant approximately the same length of time and had several years previous experience in related lines. Storch, the treasurer, had about 15 years experience before joining the Appellant in 1916. Between 1925 and 1939, the Company had five officers, one of whom died in 1939 and another who died in 1940, and who were not replaced. Two other experienced employees left the Company about the same time to enter a competing business. A number of salesmen who the Company was unable to replace were taken by the Selective Service draft. To a large extent the work of those who died or left was taken over by the remaining three officers who also had the duty of training new personnel. Government priorities added substantially to the duties of the officers during the periods in question. All three of the officers were very experienced and capable in the business of the Company, and during the periods in question often worked from 14 to 16 hours per day and on Sundays, and took no vacations.

During the year ending June 30, 1940, out of 525 outstanding shares of stock Roth owned 364 shares, Mrs. Roth owned 5 shares, McConnaughey owned 100 shares and Storch owned 50 shares, for a total of 519 shares. Out of the 600 shares outstanding on June 30, 1941, the same persons owned the same number of shares. Out of 995 shares outstanding on June 30, 1942, Roth owned 584 shares, Mrs. Roth owned 5 shares, McConnaughey owned 165 shares and Storch owned 85 shares, for a total of 839 shares.

The Appellant dealt in some 25,000 different items and had many customers in and around Dayton, Ohio, and through the Miami Valley. Most of the business was obtained through personal solicitation and contacting prospective customers. The expansion of the Army Air Force facilities in the Dayton area contributed to the increase in the Company's business, but this was not the sole reason. The Company had three types of sales: (1) Regular sales which were made out of inventory, (2) brokerage sales where the goods were delivered direct from the manufacturer to the purchaser on the Company's credit, the Company in turn adding a brokerage fee and billing the customer, and (3) commission sales where the manufacturer shipped direct to the customer on the customer's credit and paid the Company a small commission. Commission sales often required considerable planning, solicitation and layout work. Government sales involved competitive bidding with keen competition. Many bids requiring considerable prelimin-

ary work were unsuccessful. All types of sales involved a large amount of work, including preliminary work of solicitation and preparation of bids, priority problems after the sales were made, and problems connected with delivery and installation after the orders were filled by the manufacturers. The greater portion of sales on which commissions were received during the fiscal years in question were made before the start of the war in December, 1941.

The growth and success of the Company from 1937 through 1942 is shown by the following table:

plus $1 for each year of service, the total of which was multiplied by 3. The basis for bonus payments in Group 3 was the average weekly salary plus $1 for each year of service.

The Board of Directors of the Company passed the following Resolution on September 11, 1939:

"Resolved that after providing for a $5,000.00 addition to surplus and a dividend of not less than $2.00 per share, the company pay bonuses out of excess earnings on the basis of salaries and length of service, at the discretion of the Board of Directors."

|  | 1937 | 1940 | 1941 | 1942 |
|---|---|---|---|---|
| Total sales ................. | $292,199 | $479,310 | $1,876,863 | $5,029,006 |
| Gross profit ................. | 103,398 | 112,633 | 169,150 | 286,539 |
| (Before salaries, commissions and general expenses) |  |  |  |  |
| Net profit ................. | 30,613 | 23,016 | 38,958 | 57,015 |

The compensation which the Commissioner found unreasonable was paid in the form of bonuses. For bonus purposes the employees were divided into three groups: (1) The three officers, Roth, McConnaughey and Storch; (2) eight salesmen, a bookkeeper and two buyers; and (3) the remaining employees eligible for bonus payments. The formula used for computing the amount of bonus payments in Group 1 was the average weekly salary for the calendar year of 1940, not including bonuses, plus $1 for each year of service, the total of which was multiplied by six. For the year ended June 30, 1941, one bonus payment was made in each of the months of February, March, May and June and two in April. For the year ended June 30, 1942, a one-half bonus payment was made in September and one in each of the months of October, November and December, plus a regular Christmas bonus. Commencing with January 1, 1942, the bonus payments were increased to an even $100 and two bonus payments were made in each of the months of January to June inclusive. The basis for computing the amount of bonus payments in Group 2 was the individual's average salary for the calendar year 1940

On September 15, 1941, the Board of Directors passed the following Resolution:

"Resolved that the Board of Directors, after setting aside suitable reserves, in its discretion fix and pay to its officers and employees salaries and also bonuses out of excess earnings on the basis of past salaries and length of service and value of services to the Company."

The officers-stockholders determined the amount of each bonus payment and the times when such bonus payments were to be made, but full information with respect thereto was always given to the Board of Directors.

Harold Hampton, president of the Indianapolis Office Supply Company, former Vice President and President of the National Stationers' Association, and a member of its Executive Committee, and who had engaged in a business in Indianapolis similar to that of the Appellant since 1907, testified that he was familiar with the Appellant Company, that the success of such type of business depended entirely from a commercial standpoint upon personal solicitation, and that, in his opinion, the salaries paid the three officers were very reasonable.

Archie Shearer, of the Archie Shearer Company of Dayton, Ohio, testified that he had been in the office furniture business for 40 years; that he had known the three officers from 25 to 35 years; that he was familiar with their company, and that in his opinion the salaries paid to them were reasonable.

C. W. Roth also testified that if the officers of the Company had been paid a commission of 7½ to 10% on the orders secured by them, which was the usual commission in the industry, their total commissions would have been greater than what they actually received. The appellee offered no witness on the reasonableness of the salaries in question, and closed its case with the cross-examination of Appellant's witnesses and the introduction of four exhibits.

■ The applicable statute is § 23 of the Internal Revenue Code 26 U.S.C.A. § 23, which provides that in computing net income there shall be allowed as deductions "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *." Treasury Regulations 103 provide: "The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." Section 19.23(a)-6. With respect to bonuses to employees the Regulations provide:

"Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. It is immaterial whether such bonuses are paid in cash or in kind or partly in cash and partly in kind. Donations made to employees and others, which do not have in them the element of compensation or are in excess of reasonable compensation for services, are not deductible from gross income." Section 19.23 (a)-8.

The question of reasonableness is one of fact and the finding of the District Court on this issue will not be set aside unless clearly erroneous, with due regard being given to the opportunity of the trial court to judge of the credibility of the witnesses. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.

■ We are of the opinion that the findings of the District Court on the issue of the reasonableness of the compensation for 1942 were clearly erroneous and should be set aside. There was little, if any, dispute in the evidence. The appellee offered no witnesses in support of his position. No witness testified that the amounts found by the District Court as reasonable compensation in 1942 was the reasonable compensation to which the officers were entitled. The only direct evidence before the Court on the specific question of reasonableness of compensation was the testimony of Harold Hampton and Archie Shearer, both well-qualified, impartial witnesses, with many years of experience. They testified that in their opinion the compensation was reasonable, with Mr. Hampton referring to it as "very reasonable." The credibility of these witnesses was not put in issue. The appellee offered no witness to contradict this testimony or to testify in any way that the compensation was unreasonable to any extent. On this crucial and single issue of fact in this case this unimpeached, uncontradicted testimony from well-qualified, impartial witnesses can not be disregarded by the Court. This Court has several times stated that such testimony should be accepted by the fact-finder in a matter in which the fact-finder has no knowledge or experience upon which he could exercise an independent judgment. Capitol-Barg Dry Cleaning co. v. Commissioner, 6 Cir., 131 F.2d 712, 715; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 173. See Lawton v. Commissioner, 6 Cir., 164 F.2d 380, 384; Weizer v. Commissioner, 6 Cir., 165 F.2d 772, 775. As was pointed out in T. P. Taylor & Co. v. Glenn, D.C.W.D.Ky., 62 F.Supp. 495, 499, if the compensation paid is unreasonable the appellee certainly could have produced some experienced witness from the industry who would have said so, and

the failure to offer such a witness on the crucial issue in the case operates very strongly against his contention. The burden of proof in cases of this kind is upon the taxpayer, but we are of the opinion that that burden has been met when the taxpayer introduces uncontradicted, unimpeached testimony from well-qualified, impartial witnesses sustaining its contention, unless the established facts themselves are such as to show that such testimony ought not to be accepted. Heywood Boot & Shoe Co. v. Commissioner, 1 Cir., 76 F.2d 586.

This case is not of the type discussed in Botany Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379. The facts here are consistent with the testimony of the expert witnesses referred to above. The material increases in compensation over prior years were due to the material increase in business and to the operation of the bonus plan. The principle of bonus compensation is well settled and accepted. Treasury Regulations 103, supra; T. P. Taylor & Co. v. Glenn, supra, 62 F.Supp. at page 499. The business of the Appellant increased in 1941 almost 4 times over what it was in 1940, and in 1942 it again increased 2½ times over what it was in 1941. The gross profit in 1941 was 50% over that of 1940, and in 1942 it was again approximately 70% more than what it was in 1941. Although war conditions caused the industry in general to boom, yet there was keen competition for such increased business among the competing firms. The experience of the three officers, the contacts and good will established by years of work, hard work and long hours, plus the operation of the bonus plan enabled them to take advantage of the favorable situation and for a few years receive liberal compensation. But it was still compensation for personal services, and of a kind that is entitled to liberal compensation when the results were sufficiently successful to pay it. William S. Gray & Co. v. United States, 35 F.2d 968, 974, 68 Ct.Cl. 480; J. D. Vanhooser & Co. v. Glenn, D.C.W.D. Ky., 50 F.Supp. 279, 285. The ascending scale of prices during the war years is also a factor to be considered in determining the reasonableness of salaries. The compensation received, even though liberal, was not in excess of what would have been earned on a straight commission basis. The continued operation of the bonus plan by the appellant company resulted in material reductions in compensation during succeeding years. If the principle of bonus compensation is to be recognized, it carries with it the payment of liberal compensation in good years and moderate compensation in lean years.

Nor is it shown that the bonuses received bore any direct relation to stock ownership so as to result in a payment of a dividend through the guise of compensation for personal services. In 1942, Roth owned 58.70% of the stock, but received only 34.20% of the total bonus. McConnaughey owned 16.58% of the stock and received 20.39% of the total bonus. Storch owned 8.54% of the stock and received 12.07% of the bonus. Other salesmen and employees owned 14.57% of the stock and received 33.34% of the bonus. Non-employees who owned 1.61% of the stock received no bonus payment. In the previous year of 1941, the percentages were substantially the same. It is apparent that the District Judge considered such contention as without merit. He approved in full the increased compensation for 1941 where the situation in this respect was practically the same as it was for the year 1942.

The fact that much of the increased business of the Company during 1941 and 1942 was due to war conditions does not seem to be very material. In a business involving the personal services of its officers, as in the present case, increased business meant increased work and increased responsibilities. War orders added the complicated factor of priorities. While unusual economic conditions brought on by the war is a factor to be considered in these cases, the Tax Court has held several times that this alone does not establish unreasonableness where war business has resulted in increased work and responsibility. Schaberg-Dietrich Hdwe. Co., 8 T. C. 1362; Paterson Boiler & Tank, Inc., 8 T.C. 1362; Eagle Office Equipment Co., Inc., 7 T.C. 1487.

We do not find sufficient evidence to sustain the contention that the Appellant

manipulated its books or allowed unfilled orders to accumulate so as to reflect a fictitious increase in business for the fiscal years in question, or that a substantial portion of the business in 1942 was the result of orders obtained by one Klockson. Klockson died in 1940. While commission sales were not reflected on the books of the Company until after the orders were filled and the commissions paid, the evidence seems clear that such an interval rarely exceeded a period of four months time.

The issue involved in this case has recently had the consideration of this Court in the case of Wright-Bernet, Inc., v. Commissioner, 172 F.2d 343, in which a similar conclusion was reached.

The judgment of the District Court is reversed and the case is remanded with instructions to enter judgment for the full amount of the claimed refund.