SCHANCHRIST FOODS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schanchrist Foods, Inc. v. Commissioner
Docket No. 9147-74.
United States Tax Court
T.C. Memo 1977-129; 1977 Tax Ct. Memo LEXIS 308; 36 T.C.M. (CCH) 555; T.C.M. (RIA) 770129; May 4, 1977, Filed Robert E. Nelson and Arthur Kaftan, for the petitioner. Edward J. Roepsch, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax as follows: Taxable
Year Ended
Deficiency
April 30, 1972
$28,856.87
April 30, 1973
33,108.66 Concessions having been made, the sole issue for decision is whether the amounts paid by petitioner to its two officer-shareholders during the taxable years ended April 30, 1972 and April 30, 1973, constitute "a reasonable allowance for services * * * actually rendered" within the meaning of section 162(a)(1), [1] Internal Revenue Code *309 of 1954. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Schanchrist Foods, Inc., the petitioner herein, is a corporation organized under the laws of the State of Wisconsin on October 17, 1958. At the time the petition was filed, its principal office was Green Bay, Wisconsin. Petitioner filed its Federal income tax returns for the taxable years ended April 30, 1972 and April 30, 1973, with the Internal Revenue Service Center, Midwest Region, Kansas City, Missouri. With limited exceptions, the income and expenses of petitioner are reported on the accrual basis of accounting. Since its inception, petitioner's sole business has been the operation of a McDonald's restaurant at 1587 Shawano Avenue, Green Bay, Wisconsin. On August 26, 1958, Romaine W. Schanock and Carl M. Christensen (hereinafter sometimes referred to as the owners) executed a 20-year franchise agreement with McDonald's System, Inc., a wholly owned subsidiary of McDonald's Corporation, to operate a McDonald's restaurant. *310 On June 1, 1958, the owners executed a lease with Franchise Realty Corp., a wholly owned subsidiary of McDonald's Corp., to lease the facilities. On May 15, 1959, each of the two owners was issued 148 shares of petitioner's $100 par value common stock in exchange for the physical assets, the lease, and the franchise agreement which were transferred to petitioner. Since that date, they have owned all of the outstanding stock of petitioner. McDonald's informed the owners that the restaurant would open for business on October 1, 1958.However, problems were encountered in obtaining financing for the building; as a result, petitioner did not open for business until May 5, 1959. In the meantime, the owners had quit their jobs in anticipation of the October 1, 1958 opening. Mr. Schanock was previously engaged in retail sales with the Cadillac Motor Division of General Motors in Highland Park, Illinois, at an average income between $15,000 and $17,000 per year. Prior to acquiring the McDonald's franchise, Mr. Christensen worked in a supper club as an assistant manager earning approximately $7,000 per year. At the time petitioner opened for business in 1959, McDonald's restaurants *311 were relatively new to the fast food service business and the franchise name was not well known. Petitioner was the first such franchisee in the Green Bay area. In fact, petitioner was the ninety-first McDonald's restaurant world-wide. There are now over 3,400 such restaurants. With the exception of advice from one of McDonald's field consultants, the owners initially received little guidance as to the proper manner of operating the restaurant. They were required to hire 10 to 15 employees and teach them how to make the various items served and service the customers. They learned to operate the restaurant primarily through on-the-job experience. At the time few brochures or manuals were made available by McDonald's to assist them. Until at least 1961 the owners performed all the necessary duties in operating the restaurant. They scrubbed floors, washed windows, unloaded trucks, prepared the food, repaired equipment, did the daily bookkeeping, and were responsible for the advertising and promotions. They would spend from 7:00 in the morning until 11:00 or 12:00 at night seven days a week working at the restaurant. In 1961 petitioner hired a night manager who was responsible *312 for supervising the various employees. Until 1963, when petitioner hired its first full-time day-shift manager, both owners continued to manage the day shift. After the hiring of a full-time manager in 1963, Mr. Schanock and Mr. Christensen changed their working arrangement. They began to alternate weeks so that one would be working in the restaurant and the other would be doing work outside the restaurant. A McDonald's restaurant requires a substantial amount of outside work such as advertising, promotions and checking on suppliers. This work was done by the person working outside the restaurant during a particular week while the other person supervised the daily operations. This alternating week practice continues today. The original restaurant facilities consisted of the standard McDonald's restaurant building, as then approved by McDonald's Corporation and its subsidiaries. The original building did not have space for customer seating and was approximately 20 feet by 30 feet. Since 1959 petitioner has grown in size and customer volume. In 1968 the restaurant building was remodeled, with the approval of McDonald's Corporation, by extending the front of the building 12 *313 feet and one side of the building 20 feet, thereby increasing the size of the restaurant building to approximately 36 feet by 50 feet. The 1968 remodeling cost petitioner approximately $40,000. Part of the funds used to finance the remodeling was lent to petitioner by the two owners. After the completion of the 1968 remodeling, the restaurant facilities resembled the "typical" McDonald's restaurant with a seating capacity of 50 customers. In 1969 the owners and their wives purchased, through S & C Land Corp., a gas service station which adjoined the restaurant facilities. The gas station was subsequently demolished and the property was paved to provide an additional exit and parking for 50 automobiles. The property was then leased to petitioner at the rate of $1,000 per month. In order not to lose the McDonald's restaurant franchise which would expire within about six years, the restaurant building was again remodeled in 1972, with the approval of McDonald's Corporation, at a cost of approximately $120,000. At the completion of the 1972 remodeling, the building was 50 feet by 85 feet with a seating capacity of 202 customers. Mr. Christensen lent $75,000 to petitioner to assist *314 in financing the remodeling. As required by the franchise agreement and lease, the restaurant building has at all times been constructed and equipped in accordance with the blueprints and equipment layout plan which are standard for all McDonald's restaurants. All equipment used in the restaurant is standard equipment approved by McDonald's Corporation. McDonald's Corporation has furnished a substantial amount of training and assistance to petitioner. A detailed operations manual is supplied to petitioner which describes at great length the proper methods and procedures for the successful operation of a McDonald's restaurant. The owners, managers, and assistant managers have attended Hamburger University where they received basic and advanced training with regard to the proper operation of a successful McDonald's restaurant. Special assistance has been made available to petitioner from McDonald's Corporation concerning such specific areas as advertising, management, building construction, finance, food preparation, and equipment placement. In addition, McDonald's field consultants have furnished guidance to petitioner with regard to the day-to-day operation of the restaurant, *315 including discussions with the owners, managers, and assistant managers concerning the operation of the restaurant. All meat, buns, french fries, paper products and other material items served and sold by the restaurant are purchased only from vendors and purveyors approved by McDonald's Corporation, as required by the franchise agreement. However, this requirement does not relieve the licensee from the responsibility of finding the most satisfactory supplier of the various products purchased. The licensee must be careful to assure that the supplies meet the proper specifications. It also must negotiate with the supplier to obtain the best price and purchase the correct quantities to control its inventory. Over the years petitioner has changed suppliers of all of its products and has had particular problems in obtaining certain items. For example, when petitioner was using fresh potatoes for its french fries, the owners had to rent a truck and travel throughout the State of Wisconsin in search of potatoes. Petitioner has had the same approved supplier of meat since at least 1972 and of buns and french fries since 1971. In addition, petitioner, as well as most of the other McDonald's *316 restaurants, purchases its paper products through the same suppliers. The restaurant's menu, as required by the franchise agreement, has always consisted of the standard menu items approved by McDonald's Corporation. Petitioner never experimented with unapproved items and there were never any new menu items introduced by the owners. All petitioner's menu items have been prepared using the standard acceptable formula, as required by the franchise agreement. Under the franchise agreement, petitioner received an "advertising kit" containing such approved advertising material as could be used. All advertising material, as required by the franchise agreement, had to be submitted to McDonald's Corporation prior to publication. The material used by petitioner in advertisements or promotions was purchased from vendors approved by McDonald's Corporation. Petitioner was required by McDonald's Corporation to spend a specified percentage of its gross sales for advertising. During the earlier years of the operation of the restaurant, petitioner did most of its advertising on the radio or in newspapers. Television was not used due to its great expense. A licensee has discretion in the *317 manner in which its advertising is conducted although McDonald's requires that only its logos and approved advertising material be used. Both owners participate in this phase of petitioner's business. In 1968 petitioner participated in forming a cooperative consisting of nine other McDonald's restaurants in the Fox River Valley. The purpose of the cooperative is to collectively review operations and to advertise as a group to reduce costs. The organization holds a meeting once a month which both owners attend. Mr. Schanock served as its president for a four-year period which included the years 1972 and 1973. One of the best ways of increasing sales is through promotional activities. The promotions may be conducted with a charity or solely by petitioner. Since these promotions began, sales have continually increased. Both owners have devoted time to promotional activities. During the taxable years ended April 30, 1972 and April 30, 1973, the arrangement whereby each owner worked in the restaurant every other week was used. During such weeks approximately 35 hours would be spent by one of the owners in the restaurant. Their responsibilities during such time consisted *318 of supervising the "management team," checking the accuracy of invoices and employee time cards, preparing and signing checks to various vendors, balancing the cash register, preparing sales records and deposit slips, making bank deposits, periodically assisting the employees during the noon hour, taking inventory, and checking the quality of products. In addition to being in the restaurant approximately 35 hours every other week, each owner was in the restaurant three or four times during the week the other owner was required to be there under the terms of their arrangement. In addition to supervising the operation of the restaurant, arranging for advertising and promotions, and handling the relations with McDonald's Corporation, the owners must review recent developments with respect to wage and hour laws and the "OSHA" requirements and must attend the McDonald's schools and training sessions.Both owners attend the monthly meeting of the cooperative and attend the McDonald's national convention every other year. Both are also members of business associations. In addition, Mr. Schanock presently serves on McDonald's national and district advisory boards. As a result in large *319 part to the owners' efforts, knowledge and experience, petitioner has grown to be the number one McDonald's restaurant in its area and in the top 10 percent of the 3,400 McDonald's restaurants world-wide in terms of net sales. The following schedule reflects petitioner's net sales, net income, payments of compensation to owner-employees, and retained earnings during the taxable years ended April 30, 1960 through April 30, 1975: Net Income
Before
Owner's Compensation
Taxable Year
Owners'
% Net
Ended 4/30
Net Sales
Compensation
Amount
% Net Sales
Income
1960
$ 181,633
$ 21,071
$18,600
0.102
0.8827
1961
225,562
29,660
26,700
0.118
0.9002
1962
225,632
37,558
35,130
0.156
0.9353
1963
268,932
41,901
35,580
0.132
0.8491
1964
312,086
60,805 49,847
0.160
0.8198
1965
332,253
59,417
53,520
0.161
0.9007
1966
373,368
66,918
59,700
0.160
0.8921
1967
412,950
72,981
67,200
0.163
0.9208
1968
45 8,823
80,898
72,860
0.159
0.9006
1969
479,879
48,738
63,900
0.133
(1.3111)
1970
505,716
71,931
69,420
0.137
0.9651
1971
539,822
75,882
64,188
0.119
0.8459
1972
639,040
104,379
89,720
0.140
0.8595
1973
798,326
120,356
95,400
0.120
0.7926
1974
991,289
116,789
99,380
0.100
0.8509
1975
1,105,723
153,553
99,200
0.090
0.6460
$7,851,034
$1,162,837
$1,000,345
0.127
0.8603
*320 Net Income *
Taxable Year
After Owners'
Retained
Ended 4/30
Compensation
Earnings
1960
$ 2,471
$ 1,225.59
1961
2,960
2,318.98
1962
2,428
874.45
1963
6,321
5,571.49
1964
10,958
10,882.64
1965
5,897
11,852.24
1966
7,218
15,752.00
1967
5,781
17,430.05
1968
8,038
24,008.91
1969
(15,162)
7,024.4 2
1970
2,511
9,535.13
1971
11,694
23 ,041.05
1972
14,659
33,185.06
1973
24,956
57,177.29
1974
17,409
64,636.40
1975
54,353
117,601.83
$162,492
$402,117.53
In 1966 Mr. Schanock organized Schanock Foods, Inc. and opened a second McDonald's restaurant on the east side of Green Bay, Wisconsin (hereinafter east-side restaurant). Before the opening of the east-side restaurant, Mr. Schanock obtained a franchise and lease from McDonald's Corporation, interviewed the manager, hired the employees, trained some of the employees, and spent time at the east-side restaurant. The east-side restaurant has the same complement of managers as does the restaurant operated by petitioner. Mr. Schanock has an office at the east-side restaurant. In 1968 Mr. Schanock acquired an interest in *321 Ferryan Enterprises, Oshkosh, Wisconsin. Since 1968 he has been a member of the board of directors and has attended one or two meetings of the board of directors each year.
Sometime prior to 1972 Mr. Schanock invested approximately $90,000 in Madison Hotel Associates, Madison, Wisconsin, a limited partnership. Once a week Mr. Schanock received a brochure concerning the results of the hotel's operations. After reviewing the report, he would discuss the results of the hotel's operations with the hotel's management. Madison Hotel Associates incurred substantial losses from 1972 through 1974. Mr. Schanock's share of the loss was $12,000 in 1972 and $61,000 in 1974. During the taxable years ended April 30, 1972 and April 30, 1973, Mr. Schanock attended two or three evening meetings in Madison, Wisconsin, regarding the operation of the hotel. In 1973 Mr. Schanock organized Schanock Enterprises of which he is the sole stockholder. After obtaining a franchise agreement and lease from McDonald's Corporation, a McDonald's restaurant was opened in 1974 by Schanock Enterprises in Ashwaubenon, Wisconsin, a suburb of Green Bay, Wisconsin. The location of the Ashwaubenon restaurant was *322 within the exclusive three-mile territory of petitioner under its franchise agreement with McDonald's Corporation. Petitioner did not receive any compensation for allowing the restaurant to be built within its exclusive three-mile territory. The east-side and Ashwaubenon restaurants are presently managed and supervised by Mr. Schanock, his 25-year old son, and other managers hired by Mr. Schanock. The managers of these restaurants operate the restaurants during the noon hour without the assistance of Mr. Schanock. In addition to their regular duties and responsibilities, the managers balance the cash registers, prepare the deposit slips, and deposit the daily business receipts. The average annual salary of the managers of the east-side and Ashwaubenon restaurants is presently $15,000. The acquisition and operation of these franchises has not reduced Mr. Schanock's responsibilities with respect to or the time devoted to petitioner. Since 1959 Mr. Christensen's sole business activity and interest, with the exception of S & C Land Corp., has been his participation in the operation of the restaurant owned by petitioner. The owners have remained equal shareholders of petitioner *323 since its organization. Mr. Schanock has served as president of petitioner since its organization and Mr. Christensen as secretary-treasurer. Both owners, together with their wives, have continuously been directors of petitioner. Until the close of the taxable year ended April 30, 1969, the owners' compensation was based upon a percentage of sales. This arrangement was changed in 1969 to a formula recommended by Jesse Hollingsworth, petitioner's accountant. Mr. Hollingsworth obtained this formula from an agent of the Internal Revenue Service when the agent was conducting an audit of one of his clients. The agent suggested the formula for use in determining compensation of officers of close corporations. The compensation resulting from the use of the formula suggested consists of a base salary plus a bonus based upon a decreasing percentage of the profits of the corporation. In computing the amount of profits, the base salaries are deducted and a certain percentage of invested capital is deducted and retained for future growth of the corporation. The bonus is then computed by applying a decreasing percentage to $10,000 increments in profit. The formula was adopted in 1969 *324 and was first placed in effect for the taxable year ended April 30, 1971. Under the formula a base salary of $30,000 is used and 4 percent of invested capital is retained for future growth. Thereafter, each owner is to receive as a bonus 50 percent of the first $10,000 of net profits, 40 percent of the next $10,000, 30 percent of the next $10,000, 20 percent of the next $10,000, and 10 percent of the remaining profits. This formula has been consistently applied by petitioner since its adoption. Under this method of computing compensation, the owners were each paid the following amounts of compensation for the taxable years ended April 30, 1971 through April 30, 1975: Taxable
Base
Year Ended
Salary
Bonus
Total
4/30/71
$30,000
$ 2,094
$ 32,094
4/30/72
30,000
14,860
44,860
4/30/73
30,000
17,700
47,700
4/30/74
30,000
19,690
49,690
4/30/75
30,000
19,600
49,600
Petitioner has periodically issued notes payable to the owners for salaries, bonuses and directors fees when there was a shortage of cash available to pay them. The notes were issued in equal amounts to each of the owners. The only fringe benefit petitioner provided the owners *325 during the years in question was group health insurance. A pension plan was maintained for one year and then terminated. Approximately $1,500 of vested benefits obtainable at age 65 were then in the plan. Mr. Christensen presently receives $32 per month under this plan. The following amounts were paid by petitioner to the owners' wives: Calendar
Mary
Rosemary
Year Ended
Schanock
Christensen
Total
1975
$2,000
$2,000
$4,000
1974
1,000
1,000
2,000
1973
2,000
2,000
4,000
1972
1,000
1,000
2,000
1971
1,000
1,000
2,000
1970
2,000
2,000
4,000
1969
1,000
1,000
2,000
Totals:
$10,000
$10,000
$20,000
With the exception of occasionally observing the operation of the restaurant, the owners' wives have not performed any services at the restaurant since 1960. The owners' wives did attend the board of directors meetings. Ron DeBeck was first employed by petitioner in October 1961. After graduating from high school, he attended a business school for approximately two months. Since 1965 he has acted as the manager of the day shift. Mr. DeBeck received the same training with regard to the successful operation of a McDonald's restaurant *326 as the owners and other managers and assistant managers. In addition to managing the daily operations of petitioner, Mr. DeBeck has, in the owners' absence, balanced the cash register, prepared the cash deposit slips and deposited the daily business receipts. During the taxable years ended April 30, 1972 and April 30, 1973, Mr. DeBeck was paid by petitioner a total salary of $11,010 and $12,998, respectively. The aforementioned salaries include a $500 bonus for each fiscal year. Mr. DeBeck's salary was $14,745 for the taxable year ended April 30, 1975. Petitioner did not pay a dividend until the taxable year ended April 30, 1968, during which a $100 dividend was paid to each owner. For the taxable year ended April 30, 1969, petitioner incurred, after deducting owners' compensation of $63,900, a net operating loss of $15,162.42 and had not again paid a dividend prior to the close of the taxable year ended April 30, 1975. On its Federal income tax returns for the taxable years ended April 30, 1972 and April 30, 1973, petitioner deducted as compensation paid to its officers the amounts of $89,720 and $95,400, respectively. In his statutory notice of deficiency, the Commissioner *327 determined that such compensation was unreasonable to the extent of $65,720 for the taxable year ended April 30, 1972, and to the extent of $69,000 for the taxable year ended April 30, 1973. OPINION The sole issue for decision is whether the amounts paid by petitioner to its two officer-shareholders are deductible as reasonable compensation for services rendered. Section 162(a)(1), Internal Revenue Code of 1954, permits a taxpayer to deduct as an ordinary and necessary business expense "a reasonable allowance for salaries or other compensation for personal services actually rendered." Petitioner has the burden of showing that the amounts paid were in fact reasonable compensation for services rendered and are thus deductible as an ordinary and necessary business expense. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Hammond Lead Products, Inc. v. Commissioner,425 F.2d 31, 33 (7th Cir. 1970). Whether amounts paid employees represent reasonable compensation for services rendered is a question of fact to be determined *328 on the basis of the particular circumstances in each case. Huckins Tool and Die, Inc. v. Commissioner,289 F.2d 549 (7th Cir. 1961). In instances where the employee to whom the compensation was paid is also in control of the corporation, the relevant facts must be closely scrutinized. Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). The amount paid each officer-shareholder is to be judged separately in determining whether it is reasonable. L. Schepp Co. v. Commissioner,25 B.T.A. 419, 429-430 (1932). A listing of pertinent factors to be considered is found in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949). Although that case reversed a Memorandum Opinion of this Court, the factors listed therein have been reviewed and adopted by this Court on numerous occasions. The factors are listed in the following language: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in *329 reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir. 32 F.2d 42, 45, 68 A.L.R. 696; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 172; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131 F.2d 712, 715. The situation must be considered as a whole with no single factor decisive. [178 F.2d at 119.] *330 After applying the above factors to the record before us, we are convinced that the amounts paid by petitioner to its two officer-shareholders constitute reasonable compensation for services rendered. While we recognize that the amounts in question approach the upper limits of the range of compensation that could properly be considered reasonable, we are nevertheless satisfied that the payments are within the range of reasonableness. Although we will specifically refer only to those factors on which the parties and this Court have placed the greatest reliance, we have carefully considered all relevant criteria in reaching our decision. Petitioner's dramatic growth in net sales prior to and during the years in question was in large measure due to the owners' knowledge, ability, experience and hard work. Net sales increased from $181,633 during the taxable year ended April 30, 1960 to $639,040 and $798,326 during the taxable years ended April 30, 1972 and 1973. The rate of return on the original invested capital was 19.27 percent and 38.21 percent for the taxable years ended April 30, 1972 and 1973, respectively. Although petitioner's success in recent years is no doubt partially *331 attributable to the McDonald's reputation, the fact that petitioner was number one in its area and in the top 10 percent of the 3,400 McDonald's restaurants world-wide in terms of net sales can only be attributed to the efforts of the two owners. McDonald's own confidence in Mr. Schanock's ability is evidenced by the fact that he was recently appointed to both its national and district advisory boards and that they approached him in 1973 regarding the opening of a McDonald's restaurant despite the receipt of 20,000 to 25,000 inquiries each year concerning the manner in which a McDonald's restaurant franchise can be obtained. Respondent's contention that the owners had limited duties and responsibilities and worked in the restaurant only on a part-time basis ignores the overwhelming and virtually uncontradicted evidence to the contrary. His statement relating to the number of hours the owners worked in the restaurant is based upon the testimony of a former employee who worked only a limited number of hours during the day and terminated his employment with petitioner approximately two years before the period in question. Respondent's contention disregards not only the testimony of *332 Ron DeBeck, who has acted as the day-shift manager since 1965, but also that of one of his own witnesses, Richard Collins, a McDonald's field consultant, who testified that unlike many owners who achieve a certain level of success, Mr. Schanock and Mr. Christensen continued to actively attend to the business of operating the restaurant. The ratio of owners' compensation to net sales and the ratio of owners' compensation to net income during each year in question compares favorably to such ratios in prior years. Such ratios have been fairly consistent over a 15-year period. See Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949); Commercial Iron Works v. Commissioner,166 F.2d 221, 223 (5th Cir. 1948); Clinton Co. v. Commissioner,159 F.2d 102, 104 (7th Cir. 1946). In fact, the two ratios for the taxable year ended April 30, 1973, are less than the average of each such ratio for all years. Although we are unable to conclude that the owners' compensation was fixed "pursuant to a free bargain" within the meaning of section 1.162-7(b)(2), [2] Income Tax Regs., we are satisfied that the compensation formula was fixed *333 pursuant to a good faith attempt by the owners to arrive at a reasonable level of compensation for themselves and was not intended as a means for distributing the earnings of the corporation. The basic formula was suggested by an agent of the Internal Revenue Service to petitioner's accountant as a method of compensating officers of close corporations. Under the formula a percentage of the original invested capital is retained for growth and the percentage of net profits paid as a bonus decreases markedly as net profits increase. Thus, unlike the formula in Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975), petitioner retains a larger percentage of net profits as such profits increase. While such factors do not elevate the formula to the status of one fixed "pursuant to a free bargain," they do bear upon the question of whether the payments were in fact purely for services rendered. *334 Petitioner failed to introduce any evidence relating to the amounts which "would ordinarily be paid for like services by like enterprises under like circumstances." Sec. 1.162-7(b)(3), Income Tax Regs. Such evidence, of course, would have a bearing upon the issue before us. However, it is only one of several factors to be considered. A comparison to the salaries paid to owners of other McDonald's restaurants in the area would have been of limited relevance, for the evidence establishes that petitioner was more successful than the other McDonald's restaurants in the area and most throughout the country and this success was due in large part to the efforts of the two owners. Thus, petitioner could justify paying them more compensation than that paid to most other owners. Edwin's, Inc. v. United States,501 F.2d 675, 677 (7th Cir. 1974). Even assuming arguendo that the duties and responsibilities of the owners were comparable to those of Ron DeBeck, petitioner's day manager, a comparison of their compensation would serve no useful purpose. As was noted by the Seventh Circuit in Edwin's, Inc. v. United States,supra, *335 ownership, while not justifying a higher salary than would be paid to a comparable non-owner employee, is a factor which cannot be ignored. In support of its statement, the Court made the following observation: Whether it would be true in every case or not, it is a fair general assumption that the owners of a business, particularly one which they have built up from scratch, will have the personal incentive not necessarily shared by hired help, and will devote those extra ounces of energy, thought, and devotion that will spell not merely the difference between success and failure but the difference between success and extraordinary success. Such would appear to be the situation in the case before us.[Fn. ref. omitted.] [501 F.2d at 678.] We are satisfied that this difference in personal incentive exists in the instant case, as evidenced by petitioner's standing in relation to other McDonald's restaurants. Prior to the taxable year ended April 30, 1975, petitioner paid only $200 in dividends. Such evidence, although relevant, is not conclusive. "While the absence *336 of dividends might be a red flag, it should not deprive compensation demonstrated to be reasonable under all of the circumstances of the status of reasonableness." Edwin's, Inc. v. United States,supra at 677, n. 5. Moreover, the fact that substantial capital improvements were made in 1968 and 1972 militates against the virtual absence of dividends. Finally, substantially all of the testimony supports the conclusion that the amounts paid constitute reasonable compensation for services actually rendered. Respondent produced virtually no relevant evidence in support of his determination. In fact, the testimony of Mr. Collins, respondent's own witness, further supported petitioner's position. "If the compensation was unreasonable for the services rendered, certainly the government could have produced some experienced witness who would have said so. The lack of such evidence operates very strongly against [its] position." Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 121 (6th Cir. 1949), quoting T.P. Taylor & Co. v. Glenn,62 F.Supp. 495, 499 (W.D. Ky. 1945). Accordingly, based upon the foregoing, we hold that the amounts *337 paid by petitioner to its two officer-shareholders during the taxable years ended April 30, 1972 and April 30, 1973, constitute reasonable compensation for services rendered and are thus fully deductible as an ordinary and necessary business expense under section 162(a)(1). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
*. Net income before Federal income tax.↩
2. Sec. 1.162-7 Compensation for personal services. (b)(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.↩