M. J. LAPUTKA AND SONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M. J. Laputka & Sons, Inc. v. Commissioner
Docket Nos. 8093-72, 4050-73.
United States Tax Court
T.C. Memo 1981-730; 1981 Tax Ct. Memo LEXIS 10; 43 T.C.M. (CCH) 177; T.C.M. (RIA) 81730; December 28, 1981. John F. Kennedy and Theodore R. Laputka, for the petitioner. Richard N. Weinstein and Crombie J. D. Garrett, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge *12 : These cases were tried before former Special Trial Judge Murray H. Falk pursuant to Rule 180, Tax Court Rules of Practice and Procedure. His report was filed with the Clerk of the Court on June 26, 1981, and was served on the parties. Petitioners filed no exceptions to the report, but respondent did file exceptions on August 10, 1981 and the cases were reassigned, pursuant to Rule 182(d) on September 22, 1981. In particular, respondent has objected to the finding and conclusion of the Special Trial Judge that the petitioner's failure to report income for the taxable year 1966 was without an intent to evade tax and, therefore, was not fraudulent within the meaning of section 6653(b), Internal Revenue Code of 1954. After careful consideration of respondent's exceptions and the evidence presented, the Special Trial Judge's report is adopted, as set forth below, without modification with respect to the addition to tax under section 6653(b) for 1966 because fraud for that year has not been proved by clear and convincing evidence. REPORT OF THE SPECIAL TRIAL JUDGE *
*13 FALK, Special Trial Judge: Respondent determined the following deficiencies and additions to tax in respect of petitioner's Federal income taxes for the taxable years specified: Taxable
Addition to Tax Under
Docket
Year
Deficiency
Sec. 6653(b) [1]
Sec. 6653(a)
8093-72
1962
$ 49,286.36
$ 24,643.18
1963
62,547.25
31,273.63
1964
54,501.95
27,250.98
4050-73
1965
61,773.00
30,886.50
1966
36,997.14
18,498.57
1967
6,411.50
3,205.75
1968
17,024.15
8,512.08
1969
1,988.66
$ 99.43
These cases were consolidated for trial, briefing and opinion. The issues presented for decision are: (1) The amount, if any, by which petitioner failed to report its income for each of the years in question; (2) whether (and, if so, to what extent) petitioner is entitled to certain deductions in excess of the amounts allowed by respondent for each of the years in issue; (3) whether petitioner is liable for the 50 percent addition to tax for fraud under section 6653(b) for each of the years 1962 through 1968, inclusive; *14 (4) whether petitioner is liable for the 5 percent addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a) for 1969; and (5) whether petitioner filed a false or fraudulent return with intent to evade tax for each of the taxable years 1962 through 1966, inclusive, with the result that the statute of limitation does not bar the assessment of a deficiency for each of those years. FINDINGS OF FACT Many of the facts have been stipulated. They and the exhibits referred to therein are incorporated herein by this reference. At the time its petitions herein were filed, petitioner's principal place of business was located in Hazelton, Pennsylvania. Petitioner is a corporation organized under the laws of Pennsylvania. Its taxable year is the calendar year. It filed its federal corporation income tax returns for the years in issue with the District Director of Internal Revenue, Philadelphia, Pennsylvania, on the dates set forth in the following table: Year
Date filed
1962
[2] 3/18/63
1963
[2] 3/18/64
1964
[2] 3/18/65
1965
10/14/66
1966
[3] 6/28/67
1967
6/14/68
1968
6/11/69
1969
4/13/70
*15 Petitioner and respondent executed written agreements pursuant to the provisions of section 6501(c)(4) effectively to extend the periods of limitation upon assessments of the taxes due for the years 1965 and 1966 to December 31, 1970, and for the years 1967, 1968, and 1969 to June 30, 1973. A notice of deficiencies for the years 1962, 1963, and 1964 was mailed on September 14, 1972, and for the taxable years 1965 through 1969, inclusive, on March 27, 1973. Assessment of a deficiency for each of the years 1962 through 1966, inclusive, is barred by the statute of limitations unless petitioner's return for such year was false or fraudulent with the intent to evade tax. (See sec. 6501(c)(1).) Michael Laputka (hereinafter referred to as Michael) began an insurance brokerage business in about 1930 as a sole proprietor. His son George Laputka (hereinafter referred to as George) joined the business in 1931 and from 1933 until its incorporation in 1950 the agency was operated as a partnership between Michael and George under the name "M. J. Laputka and Son." Theodore Laputka (hereinafter reerred to as Ted), another of Michael's sons, started to work for the agency in the 1930s. Upon *16 the formation of petitioner in 1950, 1,000 shares of its capital stock were issued; 395 to Michael, 395 to George, 100 to Ted, and 110 to T. R. Laputka Trust (which shares were to be voted by Michael). From 1950 until Michael's death in 1964, Michael was president of the corporation, Ted was vicepresident, and George was its secretary and treasurer. In November of 1954, Michael, George, and Ted executed an agreement whereby Michael agreed to sell most of his shares of petitioner's capital stock to George and Ted in consideration of certain monthly payments to be made by them. The written agreement recited that Michael would retain 10 shares for his lifetime. Voting power was to be vested equally between George and Ted. The agreement also recited that Michael would be entilted, during his lifetime, to 40 percent of the renewal commissions with respect to insurance previously written by him for Lackawanna Casualty Insurance Company and Old Republic Insurance Company (hereinafter referred to as Lackawanna and Old Republic, respectively). In 1960, petitioner's stock book was changed to reflect a stock ownership of 600 shares by George and his wife and 400 shares by Ted and his *17 wife, the latter subject to a voting trust in respect of 110 shares to be voted by Michael. Notwithstanding the agreement and modifications, Michael continued to dominate the operations of petitioner's business until about 1962. He often intermingled petitioner's funds with funds in his personal bank accounts, depositing or redepositing money into petitioner's account when and as needed. No formal directors' meetings were held. Routine matters were handled by George and Michael and important decisions were made upon consultation with Ted. Michael and George depended for their livelihoods upon the income they derived from the business of petitioner, whereas Ted was also engaged in an active law practice. In about 1962, Michael went into semi-retirement. George began to conduct the day-to-day operations of petitioner's business, although Michael still played a prominent role in making decisions regarding the business. Michael died in November, 1964, whereupon George became petitioner's president and chief operating officer and Ted became its treasurer. In spite of the November, 1954, agreement that Michael would be entitled to 40 percent of the Lackawanna and Old Republic *18 renewal commissions during his lifetime, Lackawanna, with petitioner's concurrence, contineud to make its checks payable to "M. J. Laputka" for the full amount of renewal commissions due from it. Those checks were negotiated by Michael or for his benefit during the years in question until his death in 1964. Old Republic's checks for the full amount of its renewal commisions were made payable to petitioner or to "M. J. Laputka & Sons Insurance" and were cashed by Michael or for his benefit during that same period. After Michael's death, the proceeds of most of the Lackawanna and Old Republic renewal commission checks (still being made payable as described above) were given by George of Ted to Michael's widow. The amounts thus paid by Lackawanna and Old Republic during the calendar years 1962 through 1967, inclusive, were as follows: Year
Lackawanna
Old Republic
1962
$ 5,192.11
$ 1,246.12
1963
5,701.57
924.25
1964
4,777.23
631.64
1965
5,248.21
701.36
1966
5,143.33
720.36
1967
1,239.73
123.07
Those payments were not recorded on petitioner's books of account and were not reported on its federal income tax returns. Under the 1954 agreement and *19 modifications made to it, the right to receive these renewal commissions never became an asset of petitioner. George had graduated from high school and attended several institutes and seminars on insurance and bonding. Otherwise, he received no formal higher education. Ted graduated from the Boston University school of business administration in 1941 and the Dickinson school of law in 1948. Ted's law practice consumed the majority of his time. He started his law practice at a desk in petitioner's office and, later, when he formed a law firm with several other attorneys, his law office was adjacent to petitioner's office and they shared common entrances. Ted served as legal counsel for petitioner and for petitioner's largest group of accounts, the Correale companies. [4] Ted's major contribution to the insurance agency was to bring in new accounts. However, inasmuch as he was physically close to petitioner's office, he made himself available to petitioner's employees to answer routine questions and to sign papers. He occasionally opened petitioner's mail. Ted helped to set up petitioner's bookkeeping system and exercised some supervision over the keeping of its books. He was *20 aware of petitioner's income and expenditures as shown on its books. In the early 1960s, he spent approximately 30% of his time in petitioner's insurance operation.
Ted had the use of an automobile owned by petitioner.He was on friendly terms with George and had a good relationship with Michael. He knew that George owned a vacation home at the seashore, a 33 foot boat, and that he purchased a Cadillac automobile every 2 or 3 years. Mary Petro, George's widowed mother-in-law, worked in petitioner's office a few days a week, three or four hours per day, in 1962, 1963, and 1964. She assisted the regular staff in filing, preparing mailings, and answering the telephone. She was compensated at the rate of *21 $ 25 a week for each week she worked, and her services were worth the amount paid. At all times relevant hereto, petitioner kept its financial books and records on the cash basis of accounting. The books of account were handled by office employees of petitioner under the supervision of George and Ted. The bookkeeping system was set up primarily by George and Ted and consisted of accounts receivable cards, account current ledger cards, a cash receipts journal, a cash receipts book, and bookkeeping proof sheets produced by a Burroughs machine, as well as several bank accounts. [5] It did not keep a set of double entry books and did not employ an accountant until late 1965 or early 1966. It kept no records of the nature of its travel and entertainment expenses in any of the years in issue and made no allocation between the business and personal use of its automobiles. Mail delivered to petitioner's place of business was generally placed unopened on George's desk. He opened the mail and delivered *22 checks to petitioner's employees to be recorded in the daily cash receipts book. When a premium check was recorded by an employee in the cash receipts book, an amount equal to petitioner's normal 20 percent commission was computed and entered in petitioner's books as "net commission." Ted occasionally opened the mail if George was not in the office. George kept aside some checks from the Correale companies and contingent commission checks which he chose to go unrecorded on petitioner's books. Both George and Ted understood the bookkeeping systems and had continual access to the books of account. Each year, petitioner's federal income tax return was prepared in draft form from the office records by Clara Tomko, an employee of petitioner. She added the "net commission" column in the cash receipts book and recorded that figure as gross receipts on petitioner's federal income tax return form (Form 1120). The return was then reviewed, approved, and signed. Ted signed petitioner's 1963 and 1969 returns. George signed the returns for 1962 and for 1964 through 1968, inclusive. Petitioner placed insurance for the Correale companies through several insurance carriers. During most *23 of the taxable years involved herein, George was solely responsible for the Correale companies' accounts. The Correale companies were overbilled for their insurance coverage in each of the years 1962, 1963, 1964, 1965, and 1966. [6] Bills sent to the Correale companies, on petitioner's invoices, were often as much as twice the actual cost of the insurance coverage to which they related. The Correale companies were also billed for premiums on some expired and canceled insurance policies placed through petitioner. George admits that this scheme was practiced from 1962 into 1965. The invoices in inflated amounts and for expired and canceled policies were paid by the Correale companies with checks made payable to petitioner. The checks were sometimes deposited into petitioner's accounts. On other occasions, George, in order to avoid making the usual records of such transactions, cashed the checks, sometimes depositing a part of the check proceeds to petitioner's accounts and, at other times, depositing none of the proceeds to petitioner's account.Respondent determined that the *24 amounts paid by the Correale companies in such excess premiums (that is, the amounts over the actual cost of the insurance policies and the normal commission, and the entire amounts billed for expired and canceled policies) during the calendar years 1962 through 1966 were as follows: Year
Amount
1962
$ 85,344.04
1963
108,394.63
1964
93,792.53
1965
99,929.19
1966
34,483.74
Those payments were not recorded on petitioner's books of account and were not reported on its federal income tax returns. Petitioner's failure to report this income was due to its fraud in the year 1962 through 1965, inclusive.
The amounts of contingent commissions paid to petitioner in the years at issue which George and Michael appropriated for their own personal benefit were as follows: Year
Amount
1962
$ 10,598.57
1963
13,127.84
1964
12,932.47
1965
3,874.44
1966
458.39
1967
1,294.54
1968
57.76
Those payments were not recorded on petitioner's books of account and were not reported on its federal income tax returns. When an insured canceled a policy, the insurance carrier returned the unearned premium to petitioner, which forwarded it to the insured. *25 Petitioner reported the returned premiums as returns and allowances, reducing its gross profits by the full amount thereof, whereas it had included only its commissions -- not the full amount of the premiums -- in gross receipts. In late 1965, both George and Ted became aware that the Correale companies' federal income tax returns were being audited by government agents and that insurance policies placed by petitioner for the Correale companies were being reviewed in connection with that audit. The Internal Revenue Service notified petitioner a short time later that an audit of its tax returns was being conducted. Sometime late in 1965 or early in 1966, petitioner retained a public accountant, Anthony F. Scelza, to review petitioner's books and records. He advised petitioner to file amended federal income tax returns for the taxable years 1962, 1963, and 1964. Scelza prepared amended returns for those years. He also prepared petitioner's income tax returns for 1965 through 1968 as they became due from the records which George presented to him. In preparing petitioner's federal income tax return for 1968, Scelza neglected to report capital gains realized by petitioner in that *26 year in the sum of $ 20,743.24. Information sufficient to report that income had been given to Scelza by petitioner. Petitioner claims that it had an offsetting capital loss for $ 10,000 which it had invested in Utrolon Corporation, $ 15,000 in Gerald Products, $ 1,500 in Joe Woodring & Co., and $ 9,000 in Comerila, which investments became worthless in 1967 or 1968. In his adjustments to petitioner's gross income, respondent included the above-mentioned excess premiums paid by the Correale companies in 1962 through 1966, inclusive; contingent commissions petitioner received in 1962 through 1968, inclusive; capital gains realized by petitioner in 1968; and payments made for renewal commissions by Lackawanna and Old Republic in 1962 through 1967, inclusive. Respondent determined that 20 percent of the returned premiums properly qualified as a reduction of gross profits and disallowed 80 percent of the reduction in gross profits for each of the years 1962 through 1968, inclusive. Respondent determined that petitioner's claimed deductions for (1) brokers' commissions, (2) salaries, and (3) travel, entertainment, and sales promotion expenses were to be disallowed in the years and *27 amounts set forth in the following table: Travel, Entertainment,
and Sales Promotion
Year
Commissions
Salaries
Expenses
1962
$ 1,040.00
1,665.13
1963
2,000.00
1,965.95
1964
144.16
4,155.90
1965
$ 8,820.40
17,642.32
2,138.21
1966
4,496.45
20,578.91
5,197.54
1967
2,360.82
18,595.07
8,293.63
1968
1,895.52
8,268.84
1969
2,278.34
Other adjustments made in the notices of deficiencies were not contested at the trial or on brief and our redetermination of them is deemed to have been waived by petitioner. Petitioner deducted as brokers' commissions not only amounts actually paid to licensed brokers, but the amounts of discounts given to petitioner's employees, Ted's law office employees, and others, for personal insurance policies written for them. Respondent disallowed the deduction claimed by petitioner for brokers' commissions, in its entirety, on the grounds that it could not be determined how much of the deduction represented deductible commissions to licensed brokers. Petitioner did not pay dividends in any of the years at issue. Respondent disallowed as unreasonable and excessive deductions for compensation *28 paid to Mary Petro for the taxable years 1962 through 1964 and to George and Ted for the years 1965 through 1967, inclusive. The compensation paid to them in the years indicated was as follows: Year
Mary Petro
George
Ted
1962
$ 1,040.00
$ 12,786.82
$ 7,681.57
1963
2,000.00
15,449.82
8,172.06
1964
144.16
(Not available)
1965
27,860.14
12,782.18
1966
27,853.35
16,775.56
1967
31,110.82
12,484.25
Respondent disallowed the entire amount claimed for salaries paid to Mary Petro in 1962, 1963, and 1964 on the ground that she did not perform any services for petitioner. Respondent determined that a reasonable salary for George for 1965, 1966, and 1967, was $ 15,000, $ 15,500, and $ 16,000, respectively, and that reasonable compensation for Ted for those years was $ 8,000, $ 8,500, and $ 9,000, respectively. Respondent disallowed the excess. Reasonable compensation for George for 1965, 1966, and 1967 was $ 16,500, $ 17,000, and $ 17,500, respectively, and for Ted for those years was $ 9,000, $ 9,500, and $ 10,000, respectively. Respondent disallowed the full amount claimed by petitioner as deductions for travel, entertainment and *29 sales promotion expenses on the grounds that petitioner failed properly to substantiate such expenses and because petitioner did not allocate them between personal and business expenditures. Fred Correale and George Laputka were indicted in 1970 on several counts of willfully and knowingly aiding and assisting in the preparation of false and fraudulent income tax returns (i.e., the tax returns of the Correale companies) in violation of section 7206(2). George was also indicted on several counts for attempting to evade and defeat petitioner's income taxes, in violation of section 7201. George pleaded guilty to those charges insofar as they related to the taxable year 1963 and was fined and imprisoned. Petitioner reported taxable income and respondent determined adjustments thereto and taxable income for the years and in the amounts set forth in the following table: Taxable Income
Year
Per Return
1962
$ 1,331.51 1963
2,367.45 1964
5,299.47 1965
( 3,036.70)
1966
21,374.70 1967
(11,381.63)
1968
( 2,189.08)
1969
8.39 Respondent's Adjustments
Additional
Additional
Taxable Income
Income or
Disallowed
Deductions
Determined
Year
Gross Profit
Deductions
Allowed
by Respondent
1962
$ 102,380.84
$ 4,269.96
$ 1,855.76
$ 106,126.58
1963
[7] 122,668.50
7,820.91
370.67
132,486.19
1964
112,133.87
8,819.57
634.78
125,618.13
1965
115,132.75
32,126.53
1,739.10
142,483.48
1966
43,914.15
35,639.12
500.00
100,427.97
1967
5,694.84
34,610.87
2,025.13
26,898.95
1968
37,459.19
21,545.99
1,246.27
55,569.83
1969
1,702.61
7,039.75
524.70
8,226.05
*30 Respondent also determined that part of the underpayment of tax for each of the years 1962 through 1968, inclusive, was due to fraud and that part of the underpayment for 1969 was due to negligence and intentional disregard of the rules. A part of the underpayment of tax required to be shown on each of petitioner's returns for 1962 through 1965, inclusive, was due to fraud. In this proceeding, petitioner claims that it is entitled to a capital loss deduction of $ 35,500 for 1968, not previously claimed by it, due to the worthlessness of its investments in Utrolon, Gerald Products, Joe Woodring & Co., and Comerila. OPINION Issue 1. Unreported Income
Petitioner concedes that it failed to report some of its income during the taxable years involved. It admittedly failed to report capital gains from the sale of stock in 1968. It also concedes its failure to report certain commissions, including contingent commissions, as income for the taxable years 1962 through 1968. *31 Petitioner argues that the remaining adjustments to gross income and gross profit are not proper in that they do not reflect additional income to it. a. Payments by Correale Companies. Petitioner asserts that the payments of excess and fictitious premiums by the Correale companies cannot be considered income to it because it did not authorize the overbilling and did not receive the fruits of those transactions. Petitioner argues, alternatively, that, if we find the premiums to be income to it, it is entitled to an offsetting embezzlement loss deduction under section 165. A corporation is taxable on monies it receives from transactions authorized by it or within the scope of its corporate activities, or where it has command over the monies received. Union Stock Farms v. Commissioner, 265 F.2d 712 (9th Cir. 1959). The payments in issue here were made in response to or supported by petitioner's invoices. They were in the form of checks mailed to petitioner's office and payable to "M. J. Laputka & Sons." All or a portion of the proceeds were often deposited in petitioner's bank accounts and expended by it for corporate purposes. All of this was accomplished *32 by or through petitioner's chief operating officer, to all outward appearances acting on petitioner's behalf. The transactions giving rise to this income are properly to be treated as having been authorized by petitioner and the income as having been received by it. It is axiomatic that a corporation can act only through its officers and other agents. Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 231 (3rd Cir. 1967). Petitioner relies upon Sherin v. Commissioner, 13 T.C. 221 (1949), and All Americas Trading Corp. v. Commissioner, 29 T.C. 908 (1958). In Sherin, the deficiency was asserted as to certain payments by customers to the corporate-petitioner's president for silk goods at prices over the OPA ceiling price. Such funds were used for the president's personal benefit. In All Americas Trading Corp., the deficiency was asserted as to certain "kickbacks" received by the president. In both cases, we held that the payments were not income to the corporations. Petitioner points to the nature of the transactions in those cases as being beyond the usual, lawful business operation of those corporations. Petitioner *33 claims that, since Michael and George's scheme was also illicit, the monies received should not be characterized as income to petitioner, but, rather, as income only to Michael and George, individually. The factual patterns in the cases cited by petitioner are, however, significantly distinguishable from the facts of this case. In All Americas Trading Corp., the president, one Avirgan, was, during the years in issue, a minority shareholder at first and then merely a salaried employee. His main function was that of purchasing agent. The majority shareholder, Tandeter, "directed and controlled the corporate operations, giving complete instructions to Avirgan on how to conduct the business of [the corporation.]" 29 T.C. at 910. Suppliers of the corporation had an oral arrangement with Avirgan personally whereby Avirgan received kickbacks on purchases made. The payments were not made to or through the corporation nor upon the corporation's invoices. We held that the monies received were received by Avirgan under a claim of right and not on behalf of the corporation. 29 T.C. at 913. We distinguished the numerous cases where money received by virtue *34 of such a scheme was held to be income to the corporation [8] and concluded: Avirgan was only a minority shareholder, although he was entitled to 50 per cent of the profits, until June 21, 1950, after which date he held no beneficial title to any stock. He was only the nominal president of petitioner, although having the power to sign checks binding the petitioner. He was in reality only a purchasing agent, with Tandeter in actual control of the petitioner. Avirgan cannot be regarded as acting for the corporation in receiving the kickbacks. * * * [29 T.C. at 913.] In Sherin, the petitioner-corporation operated a manufacturing and sales business. Messrs. Berger and Sherin were equal shareholders. Berger was president and in complete charge of the sales operations, working out of the corporate offices in New York City. Sherin, the secretary-treasurer, managed *35 the production operation at the Elmira, New York, plant.Berger made a secret arrangement to receive kickbacks from buyers in the form of an excess amount over the OPA ceiling prices.Sherin knew nothing of the plan. All funds were payable to Berger, individually. The president was not a majority or controlling shareholder and his actions could not be characterized as those of the corporation. We held that the corporation had not authorized the illicit payments and therefore there was no income to the corporation. The corporation in Sherin never received any benefit from the transaction."Command over the income," we said, "is a primary test of taxability." 13 T.C. at 229. Both before and after Michael's death, George owned a 60 percent equity interest in the corporation. It is abundantly clear from the record that Michael and George -- and after Michael's death, George -- dominated the affairs of petitioner. On all the evidence here, this income was clearly solicited by and paid to the corporate petitioner. Petitioner seeks to avoid the conclusion we reach here on the basis that, since Ted had 50 percent voting power and was not involved in any illegal activity, *36 Michael and George could not bind the corporation by their actions. We do not accept petitioner's argument that Ted was an independent, innocent shareholder. [9] He allowed himself to be dominated by his father and by his brother with regard to petitioner's business, and we believe that he was negligent, if not consciously indifferent, in not inquiring sooner into the financial affairs of the corporation; e.g., before the Internal Revenue Service audit appeared imminent. Ted's law office was adjacent to the insurance office. He not only had access to the books and records of petitioner, but he spent time in the insurance office and was sufficiently knowledgeable of the operation to answer employees' questions. He reviewed the books and records when he approved the draft corporate tax returns. He knew that the books showed that petitioner was operating either at a loss or with only a small profit margin. He knew that George's salary in 1962 and 1963 was approximately $ 12,700 and $ 15,400, respectively (although higher in the later years). Yet, he also knew that the company had invested in numerous business ventures, that the company had bought cars for himself and for George, *37 that George owned a seashore home as well as his personal residence and a 33-foot boat, and that George purchased a Cadillac automobile every two or three years. Although Ted was not involved in the illicit scheme, we believe that he had reason to be suspicious prior to the Internal Revenue Service audit.
We conclude that the acts of the dominant shareholders here are to be imputed to the corporation, and that petitioner participated in and authorized the overbilling scheme. The monies received benefited petitioner in part and petitioner had command over that income. We hold that respondent properly included the sums generated from the overbilling scheme in petitioner's income. Petitioner attacks respondent's determination of the amount of income realized through the overbilling scheme in each taxable year. Respondent's determination is presumptively correct. See Holland v. United States, 348 U.S. 121 (1954); rehearing denied 348 U.S. 932 (1955); Valetti v. Commissioner, 260 F.2d 185 (3d Cir. 1958); Moriarty v. Commissioner, 18 T.C. 327 (1952), *38 affd. per curiam 208 F.2d 43 (D.C. Cir. 1953). The method used by respondent is deemed reasonable unless the taxpayer can show that it is arbitrary. Helvering v. Taylor, 293 U.S. 507 (1935). Petitioner's accountant testified that, due to the lack of any coherent bookkeepting system in the early 1960s, it was almost impossible for him to reconstruct the correct amount of income to be entered on the amended tax returns. The revenue agent spent much time studying whatever records were available from petitioner and from the Correale companies. We cannot say that the method respondent used to determine the deficiencies was arbitrary or unreasonable. Petitioner has not sustained its burden of showing that the amount of additional income from the Correale companies is incorrect in any of the years at issue. We do not conclude, as petitioner would have us do, that it is entitled to an offsetting embezzlement loss deduction.Petitioner argues that if the monies are includable as its income, it is entitled to an embezzlement loss deduction pursuant to section 165 for each taxable year in which funds were misappropriated by George or Michael. Respondent *39 argues that there was no embezzlement. He contends that, inasmuch as the shareholders who misappropriated the money also dominated the corporation, it would be anomalous to say that there was the requisite intent to embezzle. They would be taking money from themselves, and this does not constitute embezzlement. Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502 (10th Cir. 1973); Federbush v. Commissioner, 34 T.C. 740 (1960), affd. per curiam 325 F.2d 1 (1963). We agree with respondent. The major question is one of intent. In Federbush, supra at 750, we stated: Not only does the record indicate that the Federbush brothers had no intent to steal from the corporation, but rather, we think it reveals that they were interested primarily in reducing their taxes which was a more rewarding objective best accomplished through bypassing the corporate books with the corporate income. In this manner they would, if not detected, lighten the tax burden at both the corporate and shareholder level.* * * As in Federbush, we have not disregarded the corporate entity. Rather, we have determined that there was *40 no intent to embezzle. The money diverted by George and Michael and used by them for their personal benefit is more accurately described as disguised dividends to them. In any event, no deduction would be allowable for the years in which the alleged embezzlement took place. Normally, a theft loss otherwise qualifying for deduction is deductible in the year in which the loss is sustained. Sec. 1.165-1(d)(3), Income Tax Regs. However, if in that year there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then no loss is permitted until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Ted never instituted a stockholder's derivative suit or other proceeding on behalf of petitioner against his brother for restitution, but it appears probable that such a proceeding would have been successful. b. Commissions from Lackawanna and Old Republic. Certain checks for renewal commissions on Lackawanna and Old Republic insurance *41 written by Michael prior to petitioner's incorporation were mailed regularly by Lackawanna and Old Republic to petitioner's corporate office. The checks were made payable to "M. J. Laputka," even after Michael's death although it appears that the companies were aware of the fact of his death. We are persuaded on the basis of all the evidence that, as a matter of fact, the persons involved at the time of petitioner's incorporation and at all other times relevant hereto intended that the amounts paid by these two companies were to remain the property of Michael. The right to receive those renewal commissions from Lackawanna and Old Republic simply never became an asset of petitioner. The fact that the renewal commission checks were mailed to petitioner's office is not determinative. The office staff was not responsible for, and, indeed, there was little need for more than minimal clerical work as to those renewal checks. We hold that such renewal checks, pursuant to the agreement of the persons involved and the oral modifications thereto, are not includable in petitioner's income. Petitioner received income in addition to that which it reported on its returns in the amounts *42 determined by respondent, for each of the years 1962 through 1966 from the Correale companies, for each of the years 1962 through 1968 in contingent commissions, and in 1968 from capital gains. The amounts paid by Lackawanna and Old Republic as renewal commissions were not income to petitioner. Issue 2. Deductions and Returns and Allowances
a. Compensation of Officers and Employees. Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered" when such allowances are "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In order to be deductible, compensation must be paid purely for services and be reasonable in amount. Sec. 1.162-7(a), Income Tax Regs.; Electric and Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974); Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958), *43 cert. denied 359 U.S. 966 (1959). Whether the payments were intended as compensation for services rather than a distribution of profits is a question of fact which must be decided on the basis of the particular facts and circumstances of the case. Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without opinion 474 F.2d 1345 (5th Cir. 1973). The question of the reasonableness of the compensation is also a factual question. Charles Schneider & Co., Inc. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), cert. denied 420 U.S. 908 (1975), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The cases contain a lengthy litany of factors relevant in determining whether amounts are paid purely for services and represent reasonable compensation, see Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949); Miles-Conley Co. v. Commissioner, 173 F.2d 958 (4th Cir. 1949); *44 Irby Construction Company v. United States, 154 Ct. Cl. 342, 290 F.2d 824 (1961); Home Interiors and Gifts, Inc. v. Commissioner, 73 T.C. 1142 (1980), and no single factor is determinative, Mayson Mfg. Co. v. Commissioner, supra; Home Interiors and Gifts, Inc. v. Commissioner, supra at 1156. Thus, petitioner's failure to pay dividends is but one factor to be considered. See Laure v. Commissioner, 70 T.C. 1087 (1978); Levenson & Klein, Inc. v. Commissioner, supra.However, when the case involves a closely held corporation with the controlling shareholders setting their own level of compensation as employees the reasonableness of the compensation is subject to close scrutiny. Perlmutter v. Commissioner, 44 T.C. 382, 401 (1965), affd. 373 F.2d 45 (10th Cir. 1967). Respondent's determination that the disputed payments are not deductible is presumed to be correct and petitioner bears the burden of proving that determination erroneous. Botany Worsted Mills v. United States, 278 U.S. 282, 292 (1929); Rule 142(a), Tax Court Rules *45 of Practice and Procedure.
The amounts paid to George and Ted as salaries for the years 1962-1967 were as follows: Year
George
Ted
Total
1962
$ 12,786.48
$ 7,681.57
$ 21,921.20
1963
15,449.82
8,172.06
23,621.88
1964
(Not available)
20,256.11
1965
27,860.14
12,782.18
40,642.32
1966
27,853.35
16,775.56
44,578.91
1967
31,110.82
12,484.25
43,595.07
In issue here is the reasonableness of the salaries for George and Ted for the years 1965, 1966, and 1967, and the salary paid to Mary Petro in the amounts of $ 1,040, $ 2,000, and $ 144.16, respectively.
Beginning with 1965, there was a sharp rise in George's and Ted's salaries with no great correlative change in the amount or character of the services they provided. Petitioner introduced testimony by Ted and George to the effect that their salaries were in fact reasonable. Petitioner, citing Roth Office Equipment Co. v. Gallagher, 172 F.2d 452 (6th Cir. 1949), contends that, inasmuch as respondent did not offer evidence to rebut these statements, the issue should be decided in favor of the petitioner. However, Roth Office Equipment Co. is controlling only where *46 the taxpayer introduces "unimpeached, uncontradicted testimony from well-qualified, impartial witnesses" sustaining its contention. 172 F.2d at 455. [Emphasis added.] While respondent did not introduce expert evidence as to what would have constituted reasonable compensation in this instance, Roth Office Equipment Co. does not contemplate the type of self-serving testimony introduced by petitioner here. The absence of persuasive evidence to justify the increases in George and Ted's salaries makes it a close question whether petitioner has carried its burden of proof to any extent. See Heil Beauty Supplies v. Commissioner, 199 F.2d 193 (8th Cir. 1952). Nevertheless, we believe that George and Ted were each entitled to some increase in salary between 1963 and 1965 in light of the additional duties and responsibilities which they had after Michael's semi-retirement in 1962 and his death in 1964.Thus, on all the evidence, we have found, and therefore hold, that reasonable compensation for George for 1965, 1966, and 1967, was $ 16,500, $ 17,000, and $ 17,500, respectively, and for Ted for those years was $ 9,000, $ 9,500, and $ 10,000. *47 Respondent erred with respect to the disallowance of the deductions for salaries paid to Mary Petro. The petitioner's office manager, Clara Tomko, a credible witness, testified that, contrary to respondent's position, Mary Petro did, indeed, work in petitioner's office a few days a week for three or four hours per day during 1962, 1963, and 1964. She assisted the regular staff in filing, preparing mailings, and answering the telephone, and we find that the $ 25.00 per week salary paid to her was not unreasonable. b. Travel. Entertainment and Sales Promotion Expense. Petitioner deducted certain amounts for each of the years 1962 through 1969 for travel, entertainment and sales promotion expenses. Petitioner presented no evidence whatever regarding the nature of any trip or activity, the parties involved, or specific amounts expended. No receipts were produced. Petitioner's accountant testified that he made an allocation between personal and business expenditures based on what he felt was reasonable. In order for deductions to be allowed for such expenditures, the taxpayer must establish that they were ordinary and necessary, and that they were proximately related to *48 its trade or business. Sanford v. Commissioner, 50 T.C. 823 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). Further, for taxable years after 1962 the taxpayer must present evidence that each item was actually expended in the amount claimed. Section 274 was added to the Code by section 4 of the Revenue Act of 1962, 76 Stat. 974, applicable to years after 1962, to curb the widespread abuse of the travel and entertainment deduction, H. Rept. 1447, 1962-3 C.B. 423, and to add stringent objective substantiation requirements to the existing law. To meet the requirements of section 274, a taxpayer must substantiate. by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, * * * (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, [or] using the facility * * *.[Sec. 274(d)(3).] Ted testified merely that petitioner incurred some expenses for entertainment.Otherwise, petitioner presented no evidence *49 as to the business purpose of the entertainment or of the amounts expended. Self-serving and vague testimony is not enough to satisfy the substantiation requirements of 274(d). Ashby v. Commissioner, 50 T.C. 409 (1968). [10]
*50 Nor is such testimony sufficient to substantiate deductions claimed for 1962 and previous years, prior to the effective date of section 274. In similar circumstances, we said in Hearn v. Commissioner, 36 T.C. 672, 673-674 (1961), affd. 309 F.2d 431 (9th Cir. 1962), cert. denied 373 U.S. 909 (1963): Petitioner appeared as a witness on his own behalf. * * * he presented no records or proof with respect to the contested items other than his own testimony. Although we do not suggest that sworn testimony itself may not be suitable proof in appropriate cases, the testimony here was so general and of such summary and conclusory character that, in our opinion, petitioner has wholly failed to carry the burden of proof, not only as to the making of the expenditures in question * * * but also as to the necessary proximate relationship between the alleged expenditures and his business. Petitioner appeared to us to be an experienced and sophisticated lawyer; and we do not feel that we should indulge in conjecture to fill the gaps in his proof. The expenses in question are of such nature as to afford considerable opportunity for abuse, and it *51 is not too much to ask of a taxpayer seeking the benefit of such deductions that he offer not only reasonably satisfying proof that the expenses were in fact incurred but also that they bore a proximate relationship to the conduct of his business. * * * Ted was unable to corroborate any travel, entertainment, and sales promotion expense in detail, not only because of the lapse of time between the alleged expenses and the time of trial, but because the corporation only haphazadly made records of such expenditures, if any. We sustain respondent's determination as to the disallowance of travel, entertainment and sales promotion expenses claimed for each of the years at issue. c. Brokers' Commissions. Petitioner wrote insurance policies for its employees and for Ted's law office employees and others not employed by petitioner. Petitioner gave these individuals discounts on the insurance. For accounting purposes, such discounts were shown on petitioner's books as brokers' commissions in addition to actual commissions paid to licensed brokers. Inasmuch as petitioner reported as income the 20 percent commission to which it was normally entitled, brokers' commissions and discounts *52 which reduced that percentage were proper offsets against that income. [11] We hold that the "brokers' commissions" were properly deducted from income and that, accordingly, respondent erred in making this adjustment. d. Return Premiums. Petitioner deducted the full amount of premiums returned by the insurance carriers when a policy was canceled. The return premium was forwarded to the insured. Petitioner, however, did not report the full amount of premiums received as income. Rather, it reported only the 20 percent commission to which it was normally entitled. In light of petitioner's method of reporting gross receipts, we sustain respondent's disallowance as returns and allowances of returned premiums in excess of 20 percent thereof. e. Worthlessness of stock. Petitioner contends that certain of its stock investments became worthless during the taxable year 1967 or 1968 for which no deduction was claimed on its returns. Section 165 permits a deduction for worthless securities. Such a loss is deductible in the year in which the *53 stock becomes totally worthless. Sec. 1.165-5, Income Tax Regs. However, the taxpayer must establish the cost basis of such stocks and that, in fact, the stocks became totally worthless in the taxable year in which the loss is claimed. Zarnow v. Commissioner, 48 T.C. 213, 217 (1967). Worthlessness of stock is a question of fact, and the conclusion that stock became worthless in the taxable year claimed may not be based only on the subjective belief or opinion of the taxpayer, but must be based on objective evidence. Boehm v. Commissioner, 326 U.S. 287 (1945). The taxpayer need not be an "incorrigible optimist," however, and prove that recoupment would be impossible. United States v. White Dental Co., 274 U.S. 398, 403 (1927). Petitioner presented oral testimony of its accountant that he had prepared a schedule of stock acquisitions and losses for the petitioner. The information, including cost basis of the stocks, was gained from conversations with George. Petitioner also submitted into evidence a letter from a referee in bankruptcy informing Utrolon Corporation (one of the corporations whose stock is in issue) that it had been *54 placed in involuntary bankruptcy. No other evidence was introduced as to the worthlessness of any stock or what was the proper year in which to take these deductions. We find the evidence insufficient to sustain petitioner's burden of proof on this issue. Even if we were to conclude that the evidence of involuntary bankruptcy of Utolon was sufficient to establish worthlessness of its stock, the evidence regarding its cost basis, as with the cost basis of each of the other claimed investments, is unsatisfactory.The testimony in this regard was conclusory, self-serving, and contradictory, and we are unable to say that the wholly unsupported statements of George to his accountant as to the cost basis of the stocks can be considered at all reliable. We therefore hold that petitioner has failed to establish its entitlement to such deductions in whole or any part. Issue 3. Additions to Tax Under Section 6653(b) for 1962 through 1968
Respondent determined that petitioner's failure to report income with respect to each of the years 1962 through 1968, inclusive, from the excess billing scheme, contingent commissions, and gain from the sale of stock was done with an intent to *55 evade tax and, therefore, fraudulent within the meaning of section 6653(b). [12] Petitioner contends that no part of any underpayment was due to fraud, or, in the alternative, that the fraud committed by its officers and shareholders should not be imputed to it. The addition to tax for fraud is imposed pursuant to section 6653(b) if any part of any underpayment of tax is due to fraud. The measure of the penalty to be assessed is 50 percent of the entire underpayment; the difference between the correct tax due and the tax shown on petitioner's return filed for each of the years at issue. Levinson v. United States, 496 F.2d 651 (3rd Cir. 1974), cert. denied 419 U.S. 1040 (1974). In order to prevail, respondent must show by clear and convincing evidence that at least a part of the deficiency was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Valetti v. Commissioner, 260 F.2d 185 (3rd Cir. 1958); Beaver v. Commissioner, 55 T.C. 85 (1970). *56 Our determination on the issue of fraud affects not only petitioner's liability for additions to tax under section 6653(b), but, also, its total liability for deficiencies asserted for the years 1962 through 1966, inclusive. Without such a finding, the statute of limitations prevents the Commissioner from asserting a deficiency as to those years. The issue of fraud is a factual question to be determined by consideration of the entire record. [13]Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). To establish fraud, respondent must show that the taxpayer intended to evade taxes which it knew or believed it owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3rd Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The critical question is whether the requisite intent is present, and this must be affirmatively *57 established by the Commissioner. Valetti v. Commissioner, supra; Drieborg v. Commissioner, 225 F.2d 216 (6th Cir. 1955); Pigman v. Commissioner, 31 T.C. 356 (1958). Fraud will not be imputed or implied and mere suspicion of fraud is insufficient. Estate of Mazzoni v. Commissioner, 451 F.2d 197 (3rd Cir. 1971), affg. a Memorandum Opinion of this Court. And this precludes a finding of fraud based simply on petitioner's failure to carry its burden of proof that it did not have unreported income as determined by respondent. Nevertheless, inasmuch as fraud can seldom be established by direct proof, it may be based upon circumstantial evidence and reasonable inferences drawn from the evidence. See Estate of Mazzoni v. Commissioner, supra; Stoltzfus v. United States, supra; Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (3rd Cir. 1957), affg. a Memorandum Opinion of this Court. We have kept these *58 admonitions carefully in mind in arriving at our conclusions. Fraudulent intent can seldom be established by a single act. Rather, we must review the taxpayer's entire course of conduct and draw reasonable and appropriate inferences therefrom. Helvering v. Mitchell, 303 U.S. 391 (1938); Gano v. Commissioner, 19 B.T.A. 518 (1930). Indicia of fraud include: A substantial understatement of income and a pattern of such understatement over several years; failure to keep any, or adequate, books and records, particularly where the taxpayer is an intelligent and experienced businessperson; extensive dealings in cash; destruction or alteration of financial records; and failure to turn over to an accountant all information necessary to prepare accurate income tax returns. [14] A plea of quality is also indicative of fraud, but not conclusive on the issue. See American Lithofold Corp. v. Commissioner, 55 T.C. 904, 924 (1971). The omission from income in 1968 of gain from the sale of stock was due *59 to a mistake on the part of Anthony Scelza, petitioner's accountant. In credible testimony, he stated that all of the information had been supplied to him, that it appeared on his worksheet, but that it was inadvertently left out of the submitted copy of the tax return. There was no fraudulent intent on petitioner's part in respect of this omission and we have not considered it further in making our determination as to the issue of fraud. We have carefully considered the evidence presented as to the possible fraudulent underpayment of taxes attributable to the overbilling scheme and commission income and we conclude that fraud has been proved by clear and convincing evidence for each of the taxable years 1962 through 1965, inclusive, in this connection. George's admission that he engaged in the overbilling scheme at least through the beginning of 1965 is highly indicative of the fraud alleged for those years. Coupled with George's guilty plea to a criminal indictment for fraud, [15] and the other circumstantial evidence presented by the respondent, we are convinced that the underpayment of tax for each of those years was done with intent to evade tax. The bookkeeping system of *60 the corporation in the early 1960s was haphazard at best, despite the fact that George, Michael, and Ted were experienced in business. Incoming mail was placed unopened on George's desk. He opened the mail and then gave checks to the employees to be recorded in the daily cash receipts book.George kept aside some checks from the Correale companies which he chose to go unrecorded on petitioner's books. He knew that those corporate receipts went unrecorded in petitioner's books of account and that they went unreported when petitioner's tax returns were prepared from the books. George cashed or deposited only a part of the proceeds of many of those checks. He was able to do so without his personal endorsement, because he was a director of the bank and had special permission to cash checks endorsed only by "M.J. Laputka & Sons." Such a practice was not allowed for other customers of the bank; that is, all corporate checks with only a corporate endorsement normally had to be deposited in full in the corporate account. George did so in order to avoid making the usual records of these transactions. Although petitioner retained an accountant early in 1966, George was less than candid *61 with him and failed to present him with all of the information regarding income properly includable in gross income, including the contingent commissions and the nature and full extent of the overbilling scheme. All of these were done with intent to conceal the true amount of petitioner's income. We hold that the addition to tax for fraud was properly asserted for each of the taxable years 1962 through 1965, inclusive. The record does not justify a finding of fraud for any of the taxable years 1966 through 1968. [16] Respondent alleges that the overbilling scheme continued through 1966. Respondent proferred as evidence of the extent of the overbilling scheme only extra-judicial summaries and charts prepared by the revenue agent. At no time was the actual evidence presented at the hearing. [17] These extra-judicial summaries were the foundation of respondent's case. Such extrajudicial summaries are not an adequate substitute for the evidence itself. They constitute inadmissible hearsay. United States v. Morse, 491 F.2d 149 (1st Cir. 1974). [18] Notwithstanding the other, circumstantial indicia *62 of fraud, absent this evidence we do not believe that respondent has proved his case to the necessary degree in respect of these years. We do not believe that the fraud penalty for the years 1966-1968 can be sustained on account of the omission from income of certain commissions. Mere suspicion of fraud is not enough. Indeed, proof by a slight preponderance of the evidence is not enough. Valetti v. Commissioner, supra at 188. In these later years, Ted became more active in the daily operation of the business because of the audit by the Internal Revenue Service. The independent accountant prepared the tax returns as they became due, and was in the process of straightening out the financial books and records of the earlier years. There is, in addition, a dramatic drop in the years 1966 through 1968 in the amounts omitted from income attributable to commissions. While there is no express doctrine of de minimus with respect to the fraud penalty, the fact that relatively small amounts of income went unreported bears on the question of intent. See Klise v. Commissioner, 10 B.T.A. 1234 (1928). It seems to us that it is unlikely that such omissions *63 were the product of an intent to evade taxes. It is not clear in this instance where the line begins and ends between fraud and negligence, but we are not permitted to sustain a fraud penalty on less than clear and convincing evidence. Valetti v. Commissioner, supra.The record must contain some convincing affirmative indication of the requires specific intent. Cirillo v. Commissioner, 314 F.2d 478, 482 (3rd Cir. 1963). *64 In the case of a corporation, the fraudulent activities of an officer or shareholder may be attributed to the corporation if: (1) The wrongdoer so dominates the corporation that it is, in reality, a creature of his will, his alter ego or (2) the agent was acting "in behalf of, and not against interests of, the corporation." [19]Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 233-234 (3rd Cir. 1967); Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973). Petitioner here relies heavily on Asphalt Industries, Inc. There, two shareholders each owned 50 percent of the stock in the petitioner-corporation. Anderson was president and devoted full time to the day-to-day operations of the business. Schwoebel was engaged in another business and only spent ten percent of his time in the corporation's affairs. Anderson consulted Schwoebel on important corporate decisions.The two were not related in any way. Each year an independent auditing firm reviewed the books and prepared the corporate income tax returns. It was not until after Anderson's death that Schwoebel learned that the former had been diverting substantial *65 amounts of corporate income for his personal use. Schwoebel immediately notified the Internal Revenue Service of the scheme and he caused the corporation to bring suit against Anderson's estate for the corporate income which had been embezzled. The Third Circuit refused to apply principles of agency to impute the Anderson's fraud to the corporation. The court characterized Schwoebel as an independent investor who, absent from the daily operation of the business, had justifiably relied on the independent audits of the books. The decision rests heavily on the court's conclusion that Schwoebel was an innocent stockholder, 384 F.2d at 235, who was damaged financially by the other shareholder's fraud. It was reluctant to impute fraud to the corporate entity and thereby cause him further financial injury. Petitioner's reliance on this case is misguided. We have already discussed in depth and dismissed the notion that Ted was in any way an innocent shareholder and believe that Asphalt Industries, Inc. is properly distinguishable on this basis. *66 We conclude that the fraud of George and Michael is attributable to petitioner. They dominated the corporation to the point where it was a creature of their will. [20] Ted acquiesced in this domination. We hold that petitioner is liable for additions to tax under section 6653(b) for underpayments of tax due to fraud for the years 1962, 1963, 1964, and 1965. Issue 4. Addition to Tax Under Section 6653(a) for 1969
Respondent determined that the underpayment of tax in 1969 was due to petitioner's negligence and intentional disregard of internal revenue rules and regulations and has asserted a 5% addition to tax pursuant to section 6653(a). This penalty is properly assessed against the taxpayer's entire tax deficiency *67 and not just against that part of it due to negligently unreported income. Abrams v. United States, 449 F.2d 662 (2d Cir. 1971). As pointed out under Issue 2, above, the deduction for brokers' commissions was not improper, given petitioner's method of reporting income. However, petitioner deducted amounts for travel and entertainment as well as automobile expenses solely on the basis of what may have been allocable to the business. The petitioner did not keep the usual records with regard to these expenses. It appears that some personal expenses may knowingly have been deducted. [21] A taxpayer will not be liable for a negligence penalty merely because he failed to keep a detailed report on travel and entertainment expenses sufficient to comply with the strict requirements of section 274, Robinson v. Commissioner, 51 T.C. 520 (1968), affd. per curiam 422 F.2d 873 (9th Cir. 1970), but he is required to substantiate his expenses enough to show that he wasn't negligent in claiming the deductions. The burden is on the taxpayer to prove that the negligence penalty has been imposed in error. Alicia Ruth, Inc. v. Commissioner, 421 F.2d 1393 (5th Cir. 1970), *68 affg. per curiam a Memorandum Opinion of this Court. Petitioner has not offered any proof that it is not liable for the addition to tax and, on this basis, the negligence penalty for 1969 must be sustained. Issue 5. Statute of Limitations
The petitioner and the respondent timely executed written agreements pursuant to the provisions of Code section 6501(c)(4), which effectively extended the period of assessments of tax due for the taxable years 1965 and 1966 to December 31, 1970 and for the taxable years 1967, 1968, and 1969 to June 30, 1973. Respondent sent deficiency notices to petitioner for 1962, 1963, and 1964 on September 14, 1972 and for 1965, 1966, 1967, 1968, and 1969 on March 27, 1973. Petitioner argues that deficiencies for the years 1962, 1963, 1964, 1965, and 1966 are barred by the statute of limitations. This question is answered by *69 our finding that the petitioner is liable for the fraud penalty for the years 1962, 1963, 1964, and 1965, but not for 1966. Code section 6501(c)(1) provides: "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, * * *, at any time." Assessments for the years 1962, 1963, 1964, and 1965 are not barred by the statute of limitations, but the assessment for 1966 is not permissible. In view of the foregoing, Decision will be entered under Rule 155. Footnotes
*. This report is prepared pursuant to Rule 182(b), Rules of Practice and Procedure of the United States Tax Court.↩
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Amended returns for 1962, 1963, and 1964 were submitted in 1966. The notice of deficiencies and this proceeding are nevertheless based on the original returns. ↩
3. Amended return.↩
4. The Correale companies are a group of coal mining and related corporations apparently controlled by one Fred Correale. The specific companies referred to as the Correale companies are: Archer Coals, Inc.; Beechwood Transportation Company; Correale Construction Company; Correale Mining Corporation; Diamond Supply Company; Honeybrook Coal Sales Company; Honeybrook Mines, Inc.; Honeybrook Water Company; Lion Coal Company; Necho Coal Company; and Shenadoah Mining Company.↩
5. Some of these books and office records were delivered to Anthony Scelza, a public accountant, in 1966 and were lost in a fire which destroyed Scelza's office on December 17, 1967.↩
6. This overbilling scheme may have been practiced before 1962, but those years are not before us.↩
7. This amount represents the difference between income not recorded on petitioner's books ($ 128,148.29) less the excess of the amount reported over the amount appearing on its books ($ 5,479.79).↩
8. See Drybrough v. Commissioner, 238 F.2d 735 (6th Cir. 1956); Currier v. United States, 166 F.2d 346 (1st Cir. 1948); Estate of Simmons v. Commissioner, 26 T.C. 409 (1956); United Dressed Beef Co. v. Commissioner, 23 T.C. 879↩ (1955).
9. See Sherin v. Commissioner, 13 T.C. 221, 229↩ (1949).
10. In the absence of adequate records to substantiate each element of an expense, a taxpayer may alternatively establish such element: (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is * * * the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is either the business relationship to the taxpayer of persons entertained or the business purposes of an expenditure, the corroborative evidence may be circumstantial evidence. [Sec. 1.274-5(c)(3), Income Tax Regs.↩ Emphasis supplied.]
11. Because respondent conceded the issue, we need not consider whether "net commissions" was a proper way to report income.↩
12. Section 6653: (b) FRAUD.--If any part of any underpayment * * * is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.↩
13. Respondent concedes that George's conviction for criminal tax fraud does not collaterally estop petitioner from litigating its liability for fraud.↩
14. See Costello v. Commissioner, T.C. Memo. 1976-399; Haddad v. Commissioner, T.C. Memo. 1960-112↩.
15. George's plea of guilty was for the taxable year 1963.↩
16. It is well settled that fraud must be proved by clear and convincing evidence for each taxable year where fraud has been asserted. Est. of Stein v. Commissioner, 25 T.C. 940 (1956), affd. per curiam 250 F.2d 798 (2d Cir. 1958); Gleis v. Commissioner, 24 T.C. 941 (1955), affd. per curiam 245 F.2d 237↩ (6th Cir. 1957). 17. The revenue agent compared the books and records of petitioner with those of the Correale companies for the years 1965 and 1966. For 1965, he prepared several summaries which, he testified, indicated the correlation between specific invoices prepared by George with checks and accompanying vouchers drawn by the Correale companies in payment of these invoices. The summaries also indicated the amount, if any, actually paid over to the insurance carriers for these "policies." The information on the summaries was gleaned from print-out sheets from the petitioner's Burroughs machine, account current ledger cards, and monthly folders compiled in the regular course of petitioner's business which contained duplicate invoices and expired policies. For 1966, similar summaries were prepared; however, the print-out sheets were not available for that year. ↩
18. This same evidence is admissible to show how the respondent computed the deficiency asserted in the statutory notice. That determination need not be based solely upon admissible evidence. Delsanter v. Commissioner, 28 T.C. 845, 858 (1957); Rosano v. Commissioner, 46 T.C. 681, 687 (1966); Suarez v. Commissioner, 58 T.C. 792, 817↩ (1972) (concurring opinion).
19. See generally Federbush v. Commissioner, 34 T.C. 740 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); United Dressed Beef Co. v. Commissioner, 23 T.C. 879 (1955); Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. 833↩ (1954).
20. We conclude also that the dominant shareholders acted in behalf of, and not against the interests of the corporation and that the corporation benefited from the fraud. The corporation had access to some of the money to pay its bills and it had access to the money which it otherwise would have paid in income taxes if all of its income were reported. Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502↩ (10th Cir. 1973).
21. See also Tomsykoski v. Commissioner, T.C. Memo. 1974-105 (taxpayer failed to substantiate deductions and took personal expenses as business deductions); Newsom v. Commissioner, T.C. Memo. 1974-265↩ (taxpayer took spurious dependency exemptions and claimed head of household status).